No. 87-117

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

---

JAMES O. WHITTINGTON,
        Claimant and Appellant,

   -vs-

RAMSEY CONSTRUCTION AND FABRICATION,
        Employer,
   and

STATE COMPENSATION INSURANCE FUND,
        Defendant and Respondent.

---

APPEAL FROM:   The Workers' Compensation Court, The Honorable Timothy
               Reardon, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Lynaugh, Fitzgerald, Hingle & Eiselein; Michael G.
        Eiselein, Billings, Montana

    For Respondent:

        Crowley Law Firm; William J. Mattix, Billings, Montana

---

Submitted on Briefs:  Aug. 27, 1987

Decided: November 5, 1987

Filed:   NOV 5 - 1987

_Ethel M. Harrison_
_____
               Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

The family of James O. Whittington continues his appeal of the Workers' Compensation Court's decision not to award compensation benefits under § 39-71-119, MCA, for the injury Mr. Whittington said he suffered when he inhaled welding fumes and smoke while working for Ramsey Construction. Mr. Whittington was awarded Occupational Disease benefits. We affirm.

It should be noted that Mr. Whittington died of cardiac standstill on January 23, 1987 before this case was decided by the Workers' Compensation Court. His family continues in the claim for compensation benefits.

The claimant was a 52-year-old man who had worked as a welder for some 28 years when he undertook a four-day welding assignment at the Exxon Refinery in Billings, Montana, in September 1982 for Ramsey, a Plan 3 employer. He was not a permanent employee of Ramsey; he got the job as a welder on call through his local union. The claimant had a history of pulmonary difficulties. Three weeks before he undertook the welding job for Ramsey, Whittington saw Dr. Terrance J. Fagan, a Billings pulmonary specialist. Dr. Fagan noted that Whittington had been a two-pack-a-day cigarette smoker and on at least three occasions in the past twenty years had suffered breathing difficulties while either welding or cutting metal. These incidents included zinc oxide poisoning induced by his cutting of galvanized metal in Wyoming in 1964. The second incident occurred in Utah in 1972 after he had spent thirty to forty minutes welding inside an eighteen-inch pipe with no ventilation. In 1976, Whittington suffered smoke inhalation while he was air arcing and welding on stainless steel in Illinois. He received a workers'

compensation award of $22,500, less $4,500 for attorneys' fees and $18 for medical reports, for reduced lung capacity from the Illinois Industrial Commission for this last incident.

Dr. Fagan conducted an FEV 1, a test measuring the volume of air exhaled, on September 3, 1982. Whittington registered .7 while a healthy person of his age would have registered about 3.4. Whittington's lung capacity was about 20% of normal. Dr. Fagan diagnosed Whittington as having a "severe" case of airways obstructive disease. This meant that Whittington had a decreased lung capacity because his airways were scarred or abnormal; this condition could result from asthma, bronchitis, emphysema, or any combination of the three. Dr. Fagan said this condition made it inadvisable for Whittington to work as a welder, and referred him to Dr. Bruce Anderson, an allergist. Approximately one week before the welding job for Ramsey, Whittington saw Dr. Anderson. He told Dr. Anderson that he had begun wheezing while working as a welder in Illinois in 1976. He further related that while all welding made him wheeze, the problem was particularly acute when he worked with stainless steel because its fumes contained a higher percentage of chromium and nickel. Dr. Anderson determined that Whittington was not allergic to the fumes; but he felt Whittington had developed asthma.

Whittington claimed he learned that he would be working with stainless steel only after he entered the job site on September 20, 1982. He contended that he was welding inside a furnace that did not afford adequate ventilation for the fumes and the smoke. He testified that because of this, he suffered from shortness of breath and coughing. Both Whittington and his wife, Laura, testified that when Whittington drove home following that shift, he remained in his vehicle for fifteen minutes or so after he had parked it

3

because he was experiencing "an awful hard time" breathing, but that he refused immediate medical attention. Whittington claimed he did not get immediate medical care because he already had a doctor's appointment scheduled for later that day. He claimed that at the appointment, Dr. Anderson prescribed a Proventil inhaler, which would allow him to breath easier while working. At his deposition, Dr. Anderson stated that he saw Whittington only once, on September 14, and that he has no record of seeing Whittington after Whittington began the job at the Exxon Refinery or of prescribing an inhaler.

Whittington worked four ten-hour shifts beginning at 6:00 p.m. and ending at 4:00 a.m. the following morning. These shifts started the evenings of September 18, 20, 21, and 22, 1982, according to Ramsey's payroll records. Whittington testified that his welding produced about "as much [smoke] as a barbecue would put out." However, he claimed that he was forced to lean directly over his welding rod because the nature of the scaffolding and the ventilation was poor. He testified that the foreman on the job was Gary Wiech, whom he said he knew, and that it was Wiech he confronted when he discovered that he was welding on stainless steel. Further, he said Wiech instructed him to redo the welds and refused to reassign him away from the stainless steel. Whittington also denied that he had ever been a heavy tobacco smoker. He said he had smoked one year as a teenager and then off and on since 1969, figuring that he smoked perhaps thirty cigarettes per week. He acknowledged that he was smoking in 1982 and that even at the time of the hearing he still would smoke occasionally if anybody offered him a cigarette.

Ramsey employees also testified by deposition. Terry Mammenga, Ramsey's cost accountant and payroll supervisor,

4

stated that Whittington had worked for Ramsey on two other occasions that summer at another refinery. He also testified that Gary Wiech, whom Whittington claimed was foreman at the Exxon job, was never assigned to Exxon and indeed had supervised Whittington on the two occasions he worked at the other refinery. Mammenga stated that no Workers' Compensation claim had been filed through his office. Hank Cantrill testified that he had been Ramsey's night shift supervisor and that he remembered Whittington because he had caught Whittington smoking while working inside the furnace, which he said was a serious infraction of work rules at a refinery. He also said that work crews had cut holes in the walls of the furnace to provide ventilation and that there was no need for a welder to bend directly over his welding rod.

Whittington sought Workers' Compensation benefits on the theory that his exposure to nickel and chromium fumes from welding stainless steel constituted an injury that aggravated his pulmonary obstructive disease to the point that he could not take part in anything more strenuous than walking a limited distance in his yard, playing cards, reading, or watching television. He was forced to resort to oxygen often since overexertion easily winded him.

Whittington filed his claim for benefits on July 29, 1983. The Workers' Compensation Division determined the claim to be in the nature of one for Occupational Disease benefits. An Occupational Disease Medical Panel composed of Dr. Fagan, Dr. John W. Strizich of Helena, and Dr. Thomas Schimke, then of Missoula, reported its findings on September 21, 1984:

> It is agreed that Mr. Whittington is totally disabled and suffering from severe obstructive lung disease. [We] feel that the basic fundamental problem

> producing his obstructive lung disease is a long history of substantial cigarette smoking.
>
> However, it is felt by all of us that his welding of stainless steel probably contributed significantly to the progression of his underlying lung disease.
>
> It is agreed by all of us that his occupation contributed 40 percent to his current disability.

On November 14, 1984, the Division determined Whittington was entitled to 40 percent total disability benefits and awarded him $105.20 per week (40 percent of the $263 per week applicable in September 1982 when Whittington's job ended). Whittington's benefits were reduced to $77.90 per week when Social Security offset was figured. On May 1, 1985, Whittington filed his petition for Workers' Compensation benefits.

The Workers' Compensation hearings officer, Robert J. Campbell, considered medical testimony introduced by deposition along with the live testimony of Whittington and his wife. Dr. Fagan, the Billings internist who originally saw Whittington, testified that Whittington's exposure to the welding fumes may have caused him a temporary irritation, but he testified to a reasonable degree of medical certainty that Whittington would have recovered from any effects of those fumes within the month. He stated that welding fumes, even those from stainless steel, are not associated with permanent pulmonary disease and said Whittington's condition was attributable to his smoking:

> Q. [By Mr. Mattix] What was the effect of smoking? What would be the effect of smoking in a gentleman with Mr. Whittington's condition?

6

A. Well, I considered this disease to be largely smoking induced. So, to be consistent, one would have to say that continued smoking would lead to continued worsening, and the literature does support the fact that patients with airways obstructive disease who continue to smoke will decline at a faster rate than if they would quit.

. . .

Q. What was your estimate of [welding's] role in Mr. Whittington's case [in 1982]?

A. Well, at that time I thought it probably played some role, but certainly not the major role. And the only important feature really was that he not do any more of it because it was such an obvious irritant.

Q. What is your opinion now? How has it changed?

A. I think probably that I would say that the vast majority of his problem is smoking related, and if there was an effect from welding per se, it is an irritant and probably not as the cause of permanent change, and that I have not seen anything to make me change that position at this point.

Q. When you say that opinion, Doctor, are you stating it with a reasonable degree of medical certainty?

A. Yes, I think so.

The allergist, Dr. Anderson, agreed somewhat when he testified that Whittington's sensitivity to the stainless steel fumes caused his winded condition, but could not testify to a medical certainty that such fumes would cause irreversible pulmonary problems. He also could not state as a medical certainty that the September 1982 exposure to the

7

fumes aggravated the preexisting condition into one of constant discomfort.

Dr. Schimke, a specialist in pulmonary disease, diagnosed irreversible chronic airway disease, which he said was most likely caused by a history of cigarette smoking.

At Dr. Schimke's deposition, this exchange occurred:

Q. [By Mr. Mattix] Was there anything other than the welding and the work experience that Mr. Whittington related to you? Is there anything else in his history that you found significant with regard to the particular medical problem that you were examining him with regard to?

A. He was a two pack per day smoker for many years during his adult life, but he reported that he had stopped smoking during the past few years when his bronchitis was so bothersome.

Q. Why is that significant?

A. It is common to see patients who are two pack per day smokers to have some symptoms of such as Mr. Whittington complained of by the age of 53, and therefore, that historical item leads me to suspect that it was at least, in part, responsible for his complaints.

. . .

Q. All right, do you have an opinion, then, as to the cause or causes of Mr. Whittington's chronic obstructive pulmonary disease, again, within a reasonable degree of medical certainty?

A. Yes.

Q. And what is that opinion?

A. The most likely cause of his advanced chronic obstructive pulmonary disease is cigarette smoking. A contributing cause

may be the industrial smoke exposure that he sustained during a 20-year period of welding.

Q. You say may be, that may be a contributing cause. Are you able to state that it is a contributing cause to a reasonable degree of medical certainty?

A. No.

Q. And why is that, Doctor?

A. In evaluating this case for the Workers' Compensation Division, I have reviewed the medical literature in an attempt to find substantiation for lung disease of this severity based on welding fume exposure, and in my search, I found articles which suggested a possible minor aggravation of the bronchitis or lung disease, but I found nothing that would indicate to me that welding fume exposure could be the sole or a significant cause of his present condition.

Dr. Schimke testified the condition was a progressive one and said the exposure to these fumes was only a minor irritant--and only one in a series of such irritants.

The hearings examiner denied Workers' Compensation benefits. He stated that no such benefits were appropriate since Whittington had not sustained an injury as defined by § 39-71-119(1), MCA, which, before its amendment on July 1, 1987, required the claimant to prove he had suffered a "tangible happening of a traumatic nature from an unexpected cause . . . " He concluded:

None of the three medical specialists in this case would testify to a reasonable degree of medical certainty that the incident of inhaling fumes from stainless steel welding on September 21, 1982, accentuated the claimant's preexisting COPD [chronic obstructive pulmonary disease] or had anything more than a

9

temporary effect on his lungs. Avoiding all types of irritants to the lungs was advised, but no medical evidence has been submitted that the incident triggered a progressively [sic] worsening of his condition. Likewise, no medical evidence was introduced that without this incident he may have been able to continue to work under those conditions or that it resulted in any permanent damage. The evidence presented does not support the claimant's contention that an "injury" resulted in disability under the Workers' Compensation Act.

The Workers' Compensation Court accepted the hearings examiner's findings of fact and conclusions of law on March 6, 1987.

On review of the Workers' Compensation Court decision, this Court must determine if there is substantial credible evidence to support the decision. Courser v. Darby School District No. 1 (Mont. 1984), 692 P.2d 417, 419, 41 St.Rep. 2283, 2285. In this review we have carefully examined the record and have read the testimony by Whittington and his wife as well as the depositions of the various physicians and Ramsey employees.

The Whittington estate argues that one who has received an award of Occupational Disease benefits is not automatically precluded from receiving Workers' Compensation benefits. Ridenour v. Equity Supply Co. (1983), 204 Mont. 473, 665 P.2d 783. However, in Ridenour, this Court said an employee has no right to elect his benefits unless he fits the definition of both occupational disease and injury. Ridenour, 665 P.2d at 786. Section 39-72-408, MCA, says that an occupational disease arises from employment if:

(1) there is a direct causal connection between the conditions under which the work is performed and the occupational disease;

10

(2) the disease can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment;

(3) the disease can be fairly traced to the employment as the proximate cause;

. . .

Section 39-71-119, MCA, defines an injury as:

(1) a tangible happening of a traumatic nature from an unexpected cause or unusual strain resulting in either external or internal physical harm and such physical condition as a result therefrom and excluding disease not traceable to injury, except as provided in subsection (2) of this section;

(2) cardiovascular or pulmonary or respiratory diseases contracted by a paid firefighter employed by a municipality . . . which diseases are caused by overexertion in times of stress or danger in the course of his employment . . . Nothing herein shall be construed to exclude any other working person who suffers a cardiovascular, pulmonary, or respiratory disease while in the course and scope of his employment.

(3) death resulting from injury.

In Ridenour, the claimant was injured by a massive inhalation of grain dust while he was making repairs at the top of a grain bin. He had not known an unloading operation was in process beneath him when he left one area to go to another to receive the proper tools. He breathed in such a quantity of this grain dust that he was rushed immediately to a doctor. Like Whittington, the claimant in Ridenour suffered from chronic obstructive pulmonary disease, had a history of cigarette smoking, and eventually was forced to

11

retire. Unlike Whittington, he was able to convince the Workers' Compensation Court that a tangible happening of an unexpected cause occurred on a specific date, December 18, 1978, and caused him harm. Ridenour met this Court's distinction between occupational disease and industrial injury. "The two crucial points of distinction are time definiteness and unexpectedness." Wise v. Perkins (1983), 202 Mont. 157, 166, 656 P.2d 816, 820. If the claimant fails to show time definiteness and unexpectedness, there is no injury under § 39-71-119(1), MCA. Phillips v. Spectrum Enterprises (Mont. 1986), 730 P.2d 1131, 1134, 43 St.Rep. 2288, 2291.

Our distinction between occupational disease and injury is consistent with that developed by Professor Arthur Larson:

> What set occupational disease apart from accidental injuries was both the fact that they could not honestly be said to be unexpected, since they were recognized as inherent hazard of continued exposure to conditions of the particular employment, and the fact that they were gradual rather than sudden in onset. Thus, what would ordinarily be an occupational disease might be converted to an accident by an unusual and sudden dosage of the same kind of dust or fumes that, absorbed gradually over a long period, would produce typical industrial disease.

Larson, Workmen's Compensation Law, Vol 1B § 41.31, (1987).

The fact that Whittington, like the claimant in Ridenour, had chronic obstructive pulmonary disease, smoked, and breathed fumes and dust at work does not mean he suffered an injury that would qualify him for Workers' Compensation benefits. He failed to identify an unexpected tangible happening that occurred on one specific date. He claimed that the amount of smoke and fumes from the welding job was

12

unusual and unexpected. However, the Workers' Compensation Court made no such finding of fact. We uphold that court's findings when they are based on sufficient credible evidence. Coles v. 7-11 Stores (Mont. 1985), 704 P.2d 1048, 1050, 42 St.Rep. 1238, 1240. Thus, we will not determine if the evidence is sufficient to support a contrary finding. Davis v. Jones (Mont. 1985), 701 P.2d 351, 353, 42 St.Rep. 840, 843.

Whittington argued that he did not expect to work on stainless steel. Yet one physician already had told him he should do no more welding of any kind because of his pulmonary condition. And Whittington had told another physician that all welding made him cough and wheeze, but that stainless steel only made it more acute. He also cannot specify a time definite. In his petition he said the incident occurred on September 20 and said this was his first work shift. Yet Ramsey employment records indicate September 18 was his first shift.

In fact, Whittington's own testimony indicated that he had been welding for more than 28 years, had smoked a good deal of his life, and had experienced similar reactions on at least three occasions in his work history. Because Whittington could have expected to have an adverse reaction to welding and because the reaction appears to have been developing over years of welding, Whittington could neither establish this illness as unexpected nor could he assign a definite date to its onset. This malady was an occupational disease rather than an injury. It is difficult to establish a bright-line barrier between long-term disease and instant injury. A carpal tunnel syndrome that arose over the course of two months was held to constitute an injury since it arose from a chain of physical incidents, i.e. stacking of lumber. Hoehne v. Granite Lumber Co. (1980), 189 Mont. 221, 225, 615

P.2d 863, 865. But when a claimant had worked inside a copper refinery for 22 years and had been exposed to sulfuric acid, arsenic, asbestos and other compounds in his work environment, this Court held that his chronic obstructive lung disease and related physical and mental problems were diseases, not injuries. McMahon v. Anaconda Co. (Mont. 1984), 678 P.2d 661, 663, 41 St.Rep. 480, 482.

In Greger v. United Presstech, Inc. (1979), 180 Mont. 348, 590 P.2d 1121, we held that a concrete worker who suffers allergic reactions to chromium and nickel compounds in concrete has suffered an occupational disease but not an injury.

> We find that the prevailing and most convincing view is that such allergies are to be considered occupational disease. This is especially important [because] the purpose of the occupational disease act is to compensate workers who contract a disease or have inert diseases . . . when there is no "injury" as defined in section 92-418 RCM 1947, now § 39-71-119, MCA. (Emphasis added.)

Greger, 590 P.2d at 1124.

In Phillips, we held that an employee who claimed respiratory illness because he splashed solvent in his face would be denied Workers' Compensation benefits because he had been exposed to various chemicals as a welder and his bronchitis was due to continued exposure to chemicals rather than the specific instance the claimant cited. Since the claimant had had breathing difficulty before his alleged injury and had been hospitalized at times for that bronchial condition, "it is not unexpected he should suffer recurring attacks of bronchitis," and the claimant's exposure did not constitute an injury. Phillips, 730 P.2d at 1134. By the same reasoning Whittington's illness was not an injury. He

had suffered with breathing difficulties for years and had suffered harsh bronchial attacks when he welded. It was not unexpected that he should suffer breathing problems when he chose to weld again in September 1982 even though one doctor had advised him against any more welding and Whittington had told another doctor that his welding caused him breathing trouble.

Section 39-71-119(2) was interpreted in Schieno v. City of Billings (Mont. 1984), 683 P.2d 953, 41 St.Rep. 1157, to require that a firefighter who claimed his 26 years of exposure to smoke, toxic gases and fumes contributed to, or aggravated, his coronary heart disease must prove it is "medically probable" that the occupation caused the disease. In Schieno, the medical testimony was that the claimant's smoking, high blood pressure and family history of heart disease would have been sufficient to cause heart disease. Since he failed to prove by a medical probability that his heart disease was caused by his employment, he was denied permanent total disability. Schieno, 683 P.2d at 955.

In the present case, Whittington failed to prove that his disease was caused by his occupation. The physicians testified that Whittington's distress was more than likely caused by his history of cigarette smoking. Because the doctors did not tie the cause of his disease to his work by a medical probability he did not qualify for compensation under § 39-71-119(2), MCA.

The Workers' Compensation Court decision is supported by sufficient credible evidence. The claimant's welding job was neither the instantaneous, unexpected happening that disabled the worker nor was it the cause of his disease. As such, Montana law provides him and his family benefits under the Occupational Disease Act, § 39-72-101 et seq., MCA. His

request for Workers' Compensation benefits under § 39-71-119, MCA, was properly denied.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

Mr. Justice William E. Hunt, Sr., dissenting:


I dissent. The majority is incorrect when they say that Ridenour is not controlling in this case. Although the majority correctly distinguishes between occupational disease and injury, it fails to realize that this is indeed a case where "an occupational disease [has been] converted to an accident by an unusual and sudden dosage of" welding dust. Larson, Workmen's Compensation Law, Vol. 1B, § 41.31. The majority states that Whittington failed to identify an unexpected tangible happening that occurred on a specific date. In so stating, the majority ignores key testimony from both the claimant and his wife that the claimant experienced severe difficulty breathing immediately after several shifts of working on welding stainless steel. The majority ignored claimant's testimony that he became nearly housebound immediately after the attack. This is not a case when the claimant has gradually had to give up his activities due to increasing severity of his pulmonary disease. This is a case where the exposure to several days of toxic fumes resulted in such pulmonary distress as to limit the claimant to the confines of his house and yard.

The majority contends that the claimant was not able to fix his injury to a definite time. Yet it is clear that Whittington's difficulties began directly after his September, 1982, welding shifts. The majority quotes Professor Larson as stating that:

> What set occupational disease apart from accidental injuries was both the fact that they could not honestly be said to be unexpected, since they were recognized as inherent hazard of continued exposure to conditions of the particular

17

> employment, and the fact that they were
> gradual rather than sudden in onset.
> Thus, what would ordinarily be an
> occupational disease might be converted
> to an accident by an unusual and sudden
> dosage of the same kind of dust or fumes
> that, absorbed gradually over a long
> period, would produce typical industrial
> disease.

Larson, Workmen's Compensation Law, Vol 1B § 41.31, (1987).

Professor Larson has also stated:

> As to suddenness of cause:  the tendency has been
> to recognize episodes or exposures of several
> hours' or even several days' duration, since for
> all practical purposes, including those mentioned
> at the outset of this section, identification of
> the time of accident within a matter of a few days
> is sufficiently precise.. . .

> Put negatively, this is merely to say that injury,
> to be accidental, need not be instaneous.

Larson, Workmen's Compensation Law, Vol. 1B, § 39.20.

Professor Larson also states this about the time definiteness of the result of an accident.

> [I]n various situations an otherwise-gradual kind
> of deterioration may culminate in an obvious and
> sudden collapse and structural change whose
> incidence can fix the date of accident clearly.

Larson, Vol. 1B at § 39.30.

As an example, Professor Larson mentions that years of inhaling welding fumes that results in a sudden inability to breath satisfies the definition of accident.  Id.

Whittington's pre-existing disease does not preclude Workers' Compensation for an aggravation or acceleration of the disease by an industrial injury or accident.  Ridenour, 665 P.2d at 787-88.  This case squarely fits within the Ridenour analysis and claimant should not have been forced to

18

accept a lower compensation award under the Occupational Disease Act.

_____
Justice