No. 88-452

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

---

PAUL B. EASTMAN,

Claimant and Appellant,

-vs-

ATLANTIC RICHFIELD COMPANY, Employer,

Defendant and Respondent.

---

APPEAL FROM:   The Workers' Compensation Court, The Honorable Timothy
Reardon, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Paul B. Eastman, pro se, Kalispell, Montana

For Respondent:

Andrew J. Utick; Utick & Grosfield, Helena, Montana

---

Submitted on Briefs:   March 9, 1989

Decided:  May 10, 1989

Clerk

Filed:

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

The claimant, Paul Eastman, appeals from a final decision of the Workers' Compensation Court denying him benefits under the Workers' Compensation Act and affirming a compensation award of $10,000 under the Occupational Disease Act. We affirm.

Mr. Eastman appears pro se and requests this Court to review the decision of the Workers' Compensation Court in two respects. First, we are asked to determine the constitutionality of the Occupational Disease Act, and then to review the sufficiency of the evidence to support the lower court's determination. We phrase the issues as follows:

1. Does the treatment of employees suffering work-related diseases under the Occupational Disease Act violate equal protection or deny a claimant's right to full legal redress?

2. Did the Workers' Compensation Court err in determining that Mr. Eastman is entitled to benefits under the Occupational Disease Act rather than the Workers' Compensation Act?

3. Is claimant entitled to reasonable costs and attorney fees and a 20% penalty?

Paul Eastman began working for Atlantic Richfield Company (ARCO) at its Columbia Falls Aluminum plant in June 1977. He was employed as a welder, and continued in that position until he was laid off on April 26, 1985, following the closure of the Columbia Falls plant. Two weeks prior to the lay off, Mr. Eastman was exposed to an unusually large and concentrated dose of fumes while welding at the plant. He was working with a heavy metal pot in which aluminum ore is refined, when the welding debris dripped onto plastic and tar below the area and ignited those materials. The smoke and

fumes from the burning materials were much more intense and concentrated than normal.

Following the incident, Mr. Eastman left work and drove himself to the emergency room at Kalispell Regional Hospital for treatment. He was hospitalized for three days, during which time he was given large doses of steroids. Following hospitalization, Mr. Eastman returned to work until he was laid off two weeks later.

Mr. Eastman had a history of asthma prior to the incident of April 8, 1985. He first began to experience shortness of breath in 1973 during periods of heavy exercise. He continued to experience shortness of breath during exertion while employed with ARCO between 1978 and 1980, during which time he also experienced recurring bouts of bronchitis. By 1983, Mr. Eastman's condition had developed into full-blown, severe asthma, which was medically diagnosed as Chronic Obstructive Pulmonary Disease. He was first treated with antibiotics and steroid medication in April, 1983, under the care of Dr. Rosetto. The steroid treatments have continued on and off since that time. Dr. Rosetto described Mr. Eastman as "steroid dependent," meaning that the claimant is unable to go off the medication without his asthma flaring to the point where he either couldn't do anything or would end up in the hospital. Dr. Rosetto testified that the claimant's steroid dependency had existed prior to the incident which occurred in April, 1985. The medication he must take to control his asthma has severe physical and emotional side effects, which the claimant testified affects his ability to find and perform work.

Since his layoff in April, 1985, Mr. Eastman has conducted an extensive job search through the Montana Department of Social and Rehabilitative Services. Despite applying for 20 to 30 jobs, Mr. Eastman has failed to find steady

3

employment. He worked as a retail clerk in 1986, but had to quit after one day because the job required him to lift and carry 10 pound boxes which exacerbated his breathing problems and precipitated an asthma attack. A vocational counselor for the Career Exploration and Development Center testified that Mr. Eastman has the work habits, grooming, and aptitudes of competitive employment and has many transferable skills. With the exception of one day of employment, the claimant did not work at all between April 1985 and June 1987.

Mr. Eastman filed a claim for compensation with the Division of Workers' Compensation on May 21, 1985. The Division designated the claim as one for benefits under the Occupational Disease Act, although the claimant later filed a petition alleging that he was entitled to benefits under the Workers' Compensation Act because of his April 8, 1985 "injury." The determination of "injury" was consolidated with the claimant's appeal from the Division's final decision regarding compensation under the Occupational Disease Act. In that order, the Division determined that Mr. Eastman suffered from a nondisabling occupational disease and was awarded the maximum statutory allowance of $10,000 pursuant to § 39-72-405(2), MCA.

The Workers' Compensation Court affirmed the decision of the Division that the claimant's occupational disease was nondisabling. The court also addressed the "injury" issue, noting that the claimant did not elect to pursue either form of compensation, but instead presented both theories of recovery for determination. The court held that the unexpected occurrence of abnormally dense fumes at work on April 8, 1985, caused an aggravation of the claimant's preexisting asthma condition, and therefore qualified as an "injury." However, the court then concluded that,

4

> . . . the medical evidence from claimant's treating physician Dr. Rosetto clearly indicates that the claimant's medication during his three days of hospitalization returned him to his pre-exacerbation state. The claimant was then released from the hospital to return to his full-time work which he continued until he was laid off some two weeks later. Although the claimant's incident is technically an "injury," his asthma condition returned to its pre-injury state with no loss of wages or impairment being established.
>
> Having satisfied the statutory criteria for an injury, the Court's function has not ended. The overwhelming medical evidence is that claimant's April 8, 1985 exposure was disabling only for a few days and upon receiving medication he was essentially restored to his pre-April 8, 1985 condition. That condition, as well as his health after the three-day hospital stay, was a product of an occupational disease exposure as found by the Division.

Although the court determined that Mr. Eastman suffered an injury on April 8, 1985, it concluded that the injury was noncompensable under the Workers' Compensation Act. The court also concluded that the claimant was not entitled to a 20% increase in award pursuant to § 39-71-2907, MCA, nor was he entitled to reasonable costs and attorney fees under § 39-71-612, MCA. It is from this judgment that Mr. Eastman appeals.

I

Does the Occupational Disease Act violate equal protection or deny a claimant's right to full legal redress?

The employer argues that this Court should not address the claimant's constitutional arguments because he failed to present them before the lower court. It is a general rule that new issues may not be raised for the first time on appeal. Bauer v. Kar Products, Inc. (Mont. 1988), 749 P.2d 1385, 1388, 45 St.Rep. 322, 326. However, this Court "reserves to itself the power to examine constitutional issues that involve broad public concerns," and even if raised for

the first time on appeal, this Court can hear the issue if the alleged error affects the substantial right of a litigant. Cottrill v. Cottrill Sodding Service (Mont. 1987), 744 P.2d 895, 896, 44 St.Rep. 1762, 1763. Claimant has not briefed his constitutional contentions in detail. Nonetheless, considering the nature of such contentions as well as his pro se status, we will consider his constitutional challenges.

EQUAL PROTECTION

Mr. Eastman first challenges the State's classification of diseased workers under the Occupational Disease Act as arbitrary and discriminate and in violation of the Equal Protection Clauses of the U.S. and Montana Constitutions. In determining what level of scrutiny is to be applied to this legislation under an equal protection analysis, it is necessary to determine what rights are involved and whether the legislation infringes upon the rights of any suspect class. Cottrill, 744 P.2d at 897.

We have held that the right to receive Workers' Compensation benefits is not a fundamental right. Cottrill, 744 P.2d at 897, citing Shapiro v. Thompson (1969), 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600. This same rule applies to benefits under the Occupational Disease Act, which are also a form of disability benefits, so that no fundamental right is at stake here. The classification does not affect the rights of a suspect class, which would include race, nationality, alienage and wealth. Cottrill, 744 P.2d at 897. We conclude that the Act is not subject to strict scrutiny. As a result ARCO need not show a compelling state interest. We conclude that the Act should be analyzed under the rational basis test. That test requires a legitimate governmental objective which bears some identifiable rational relationship to the classification in question. Cottrill, 744 P.2d at 897.

6

Mr. Eastman argues that there is no rational basis upon which to distinguish an employee who suffers from an occupational disease from an employee who suffers an injury. We disagree. A historical inquiry into the subject reveals a legislative purpose for this differentiation.

Historically workers' compensation was enacted to compensate victims of industrial accidents and injuries. It was not set up to respond to workers suffering occupational disease. That distinction was partially explained by the common law historical background which had allowed tort suits for injuries but generally had shown that the negligence of an employer was not a basis for a common law action. As stated in 1B Larson, Workmen's Compensation Law , Section 41.20(1987):

> To the extent that compensation acts were thought of as substituting nonfault liability for the kind of injuries that were potential subjects of fault liability, there was thought to be no place for occupational diseases, which (in the sense of a disease due to the "normal" conditions of the industry as distinguished from the negligence of the employer) had consistently been held incapable of supporting a common-law action.

As the incidence of devastating diseases of the work place increased, legislatures concluded that some system of compensation was needed. Gradually the law was expanded to provide benefits for the victims of occupational disease, notably silicosis and asbestosis. 32 Labor Law Journal (1981), 212, 213.

By 1978, every state had enacted statutes making occupational diseases compensable. 1B Larson, Workmen's Compensation Law, Section 41.00. Larson points out that this lag in coverage can be attributed to the heavy incidence of silicosis and asbestosis in certain industries, for which full

7

coverage under workers' compensation would have created a difficult burden. 1B Larson, supra, Section 41.10.

Montana created a statutory remedy for work-related diseases in 1959 by the enactment of the Occupational Disease Act, § 92-1301 RCM (1947) et seq., now §§ 39-72-101 to 714, MCA. In the workers' compensation field, this Court upheld the power of the legislature to enact workers' compensation which replaced common law remedies. Shea v. North-Butte Mining Co. (1919), 55 Mont. 522, 534, 179 P.2d 499, 503. We conclude that the same rationale properly can be applied to the Occupational Disease Act. We conclude there is a rational basis for the enactment of the Occupational Disease Act by the legislature.

Claimant argues that the benefits payable under both workers' compensation and the Occupational Disease Act should be the same. We recognize the fairness of an argument for equal compensation for similar disabilities. However, the equal protection clause does not require that all aspects of occupational disease and occupational injury be dealt with in the same manner. As stated by the United States Supreme Court in Williamson v. Lee Optical Co. (1955), 348 U.S. 483, 99 L.Ed. 563, 75 S.Ct. 461:

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. (case cited) Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. (case cited) The legislature may select one phase of one field and apply a remedy there, neglecting the others. (case cited)

348 U.S. at 489.

We conclude that the claimant has failed to show that the legislature is required to award the same or comparable benefits under the Occupational Disease Act as compared to the Workers' Compensation Act. We hold that there is a rational basis for the benefits awarded under the Occupational Disease Act and that the claimant has failed to establish a violation under the equal protection clauses of the Montana Constitution and of the Constitution of the United States.

While we find that claimant has failed to show a constitutional violation of the equal protection clauses, our review of the Occupational Disease Act has shown there are serious questions which should be addressed by the legislature. In this instance Mr. Eastman has proved permanent partial disability which would entitle him to extensive benefits if he came under the Workers' Compensation Act. However, under the Occupational Disease Act, because he is not totally disabled, his award is limited to $10,000. We suggest that a review of the benefits under this Act is certainly due on the part of the legislature.

FULL LEGAL REDRESS

Mr. Eastman next argues that he was denied full legal redress under the Occupational Disease Act because of the requirement that a worker be disabled for more than five days to receive compensation. He argues that had he remained off the job for more than five days, he would have received full compensation under the Workers' Compensation Act, but because he missed only two days of work, the statutory requirement arbitrarily denies him his right to full legal redress. We point out that the five day requirement appears under § 39-71-736, MCA (1985), of the Workers' Compensation Act, and no similar requirement is contained in the Occupational Disease Act as Mr. Eastman asserts. While the lower court concluded that the claimant suffered an injury under the

9

Workers' Compensation Act, it further concluded that the injury was only temporary and did not continue to be disabling. Based on that evidence, the court held that claimant's injury was noncompensable and affirmed the Division's award under the Occupational Disease Act.

Even if claimant had proved an injury which resulted in a disability of more than five days, under the medical evidence of this case he would not be entitled to compensation under the Workers' Compensation Act. The court found that the medical evidence established that his condition returned to its pre-exacerbation state following medical treatment which extended over just a few days. We therefore hold that claimant has failed to establish a denial of his right to full legal redress because he has not been denied any compensation under the Workers' Compensation Act.

## II

Did the Workers' Compensation Court err in determining that Mr. Eastman was entitled to benefits under the Occupational Disease Act rather than the Workers' Compensation Act?

The Workers' Compensation Court found that the claimant's asthma was a preexisting condition which was aggravated by his 8 years of employment as a welder with ARCO. This Court has held that a preexisting condition of Chronic Obstructive Pulmonary Disease, which includes asthma, is compensable under the Workers' Compensation Act if a claimant can identify an unexpected tangible happening on a specific date which aggravated the condition. Whittington v. Ramsey Construction and Fabrication (Mont. 1987), 744 P.2d 1251, 44 St.Rep. 1823. Ridenour v. Equity Supply Co. (1983), 204 Mont. 473, 665 P.2d 783. Where the claimant was unable to show that his asthma was significantly aggravated by an unexpected incident rather than a deteriorating condition over time, this Court has upheld the lower court's conclusion

10

that the claimant suffered from an occupational disease rather than an injury compensable under the Workers' Compensation Act. Whittington, 744 P.2d at 1257.

In this case, the court determined that the unexpected occurrence of abnormally dense fumes at work on April 8, 1985 caused an aggravation of claimant's preexisting asthma, and that the incident was unexpected and time definite enough to qualify as an "injury" under the Workers' Compensation Act. § 39-71-119, MCA (1985). However, the court went on to conclude that the injury was noncompensable under the Workers' Compensation Act based on the medical evidence which established that the injury did not continue to be disabling. Following hospitalization and medication, the court found that Mr. Eastman was returned to his pre-exacerbation state and failed to prove any loss of wages or additional physical impairment. The court concluded that his pre-April 8, 1985 condition, as well as his health following the three day hospital stay, was a product of an occupational disease and affirmed the Division's award under the Occupational Disease Act.

It is not the function of this Court to reweigh the evidence. We will uphold the findings and conclusions of the Workers' Compensation Court if they are supported by substantial credible evidence in the record. Snyder v. San Francisco Feed and Grain (Mont. 1987), 748 P.2d 924, 929, 44 St.Rep. 2216, 2224.

The testimony which led the lower court to conclude that Mr. Eastman's injury did not continue to be disabling and was therefore noncompensable under the Workers' Compensation Act was given by several medical experts. The claimant's own treating physician, Dr. Rosetto, testified that Mr. Eastman's asthma condition would not change in the future, that his disease was not caused by any single event, and that any

11

"incident" which occurred during the progression of his disease would not change the status of his condition as it was at the time of trial. Dr. Rosetto also testified that having worked at ARCO for 8 years as a welder, the worsening of claimant's disease could have been expected, and that the incident of breathing toxic fumes did not cause any permanent significant additional impairment.

Another physician, Dr. Schimke, testified that the fluctuations in claimant's condition over 8 years showed a worsening trend, and that his employment as a welder was the cause of the disease becoming disabling.

Dr. Power examined Mr. Eastman at the request of the claims division to determine whether claimant suffered an occupational disease. The examination consisted of a general physical, chest X-rays, and a pulmonary function test, which took place in November 1985, seven months after the April 8 incident. Dr. Power testified that any aggravation caused by the incident was only temporary and that claimant's asthma had stabilized to its pre-April 8 condition.

The conclusion of the lower court that claimant's condition had returned to his condition prior to the April 8, 1985 injury does not suggest that he had returned to good health. The evidence shows that he had disability from the disease prior to April 8, 1985 and that such disability continued and grew worse thereafter. Our examination of the record demonstrates there is substantial medical evidence which shows that claimant experienced no additional physical impairment as a result of the injury of April 8, 1985. The record also contains substantial evidence to support the conclusion that his condition was the result of an occupational disease. We hold that it was not error for the lower court to conclude that Mr. Eastman's injury was not compensable under the Workers' Compensation Act.

12

## III

Is claimant entitled to reasonable costs and attorney fees and/or a 20% penalty?

The provisions for costs and attorney fees and a 20% penalty are found in the Workers' Compensation Act, §§ 39-71-612 and 39-71-2907, MCA (1985). Since this Court affirms the determination by the lower court that Mr. Eastman is not entitled to benefits under the Workers' Compensation Act, those provisions do not apply in this case.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

Mr. Justice William E. Hunt, Sr., dissenting:


I dissent. From the beginning, Eastman has been forced to surmount hurdles that would challenge even the greatest trial tactician. He appears before this Court pro se because his attorney, after collecting his fee, merged his law firm with the firm representing ARCO. Added to this burden, is the fact that Steven J. Shapiro, chief legal counsel for the Workers' Compensation Division--the same division that actively opposed Eastman every step of the way--was appointed the first hearing examiner. The facts found by Shapiro and adopted by Robert J. Robinson, administrator for the division, are the facts Eastman has had to struggle with throughout this legal and medical morass. The wonder here is not that Eastman was denied his rights as an injured Montana worker. The wonder is that he got anything at all.

The majority holds that Eastman's April 8, 1985, injury did not significantly aggravate his preexisting disease. Eastman's medical history, however, tells a different story.

Prior to the April 8, 1985, injury, Eastman's breathing difficulties forced him to seek treatment at Kalispell Regional Hospital on only two occasions. In July, 1983, he consulted with the hospital emergency room. In June, 1984, he was hospitalized. Within the four months following the accident, however, his visits to the hospital became much more frequent. He visited the hospital emergency room twice--once on May 20, 1985, and again on July 31, 1985. On August 20, 1985, he was hospitalized for four days with severe asthma.

In addition, Eastman's need to consult with his treating physician had subsided in the months preceding the injury. In 1983, he called or visited Dr. Rossetto almost monthly.

In 1984, however, he saw Dr. Rossetto twice--once in June and once in July. He called the doctor three times. His last flare up of asthma prior to April 8, 1985, occurred in December, 1984. After the April accident, however, his asthma repeatedly flared. He consulted Dr. Rossetto at least once a month thereafter.

In Ridenour v. Equity Supply Co. (1983), 204 Mont. 473, 665 P.2d 783, a claimant's preexisting Chronic Obstructive Pulmonary Disease (COPD) was aggravated by a high concentration of grain dust. We awarded the claimant permanent total disability benefits under the Workers' Compensation Act. Yet in this case, where the facts are almost identical, we award claimant a mere $10,000 under the Occupational Disease Act and send him on his way.

In Ridenour, the claimant was injured on December 18, 1978. He was unable to perform his usual job from that date, though he did attempt less strenuous work. A little over five months after the accident, his breathing difficulties became so severe that he was forced to cease employment.

Unlike the claimant in Ridenour, Eastman returned to his normal job for two weeks after the accident. He was able to do so, however, only because he was heavily medicated with steroids. He returned to work rather than remaining on sick leave because he knew ARCO was planning a large reduction in force and he wanted to work as much as possible before being laid off.

Had Eastman not been laid off as part of ARCO's general reduction in force, his breathing problems would have soon forced him to quit, just as the claimant in Ridenour eventually ceased working. Slightly over two months after the accident, on June 11, 1985, Dr. Rossetto wrote a letter to Job Service in which he stated that Eastman's condition had progressively worsened and he would be unable to work in

the foreseeable future. On September 9, 1985, Dr. Rossetto noted on the medical record that Eastman should not return to work because of recent extensive asthma attacks. Eastman himself testified that, due to his physical condition, he had not been able to return to work since the lay off even though ARCO had called him back two or three times.

The medical record amply demonstrates that the April 8, 1985, injury aggravated Eastman's disease. Nevertheless, the majority refuses to acknowledge this objective evidence. Instead, the majority relies on the deposition testimony of three doctors--even though one of the doctors, Dr. Power, did not have access to Eastman's medical record. Dr. Power's testimony indicates that he was unaware of Eastman's complete medical history.

Furthermore, the testimony of the remaining doctors does not unequivocally support the majority's holding. Dr. Rossetto testified that the injury was <u>unlikely</u> to change Eastman's medical status as of the time of the deposition. He acknowledged that since the accident, Eastman continued to have periods of severe exacerbations. He also stated that Eastman had been on steriods almost continuously since that time and was steroid dependent.

Dr. Schimke's testimony is more telling. Dr. Schimke testified that the April 8, 1985, incident was not the single underlying cause of Eastman's disease. However, he could not state with medical certainty that Eastman's status returned to his preexacerbated condition following the accident. He stated:

> I view the April, 1985, incident as but one in a long series of similar incidents. And I believe I stated if the incident caused hospitalization--and I believe that one did--it could have had some long-term lasting effect. And it is medical speculation, I think, to tell you how much or how little.

We have previously recognized that "'cautious medical testimony' should, whenever possible, be interpreted in favor of the claimant." Wheeler v. Carlson Transport (1985), 217 Mont. 254, 262, 704 P.2d 49, 54. Indeed, in Ridenour, we granted disability benefits based on testimony very similar to that given by the doctors in this case--testimony that the claimant's accident "may have resulted in more asthma and more bronchitis, which could flare up more readily in the ensuing months and years." (Emphasis added.) Ridenour, 204 Mont. at 475-76, 665 P.2d at 785. The majority in this case, however, ignores the precedent set in Ridenour and unfairly denies Eastman disability under the Workers' Compensation Act.

The majority also asserts that there is a rational basis for paying benefits to claimants under the Occupational Disease Act at a lower rate than those paid to claimants under the Workers' Compensation Act. I wish somebody would tell me exactly what that rational basis is. I certainly cannot find it in this opinion.

I would reverse the Workers' Compensation Court.

Justice

We join Mr. Justice William E. Hunt, Sr., in his dissent to the majority opinion.

Justice

Justice

- 17 -