No.   94-526

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

L. C. GULBRANDSON,

      Plaintiff,

  v.

CAROLE CAREY, FRED J. FLANDERS, CAROL
LAMBERT, TROY McGEE, SR., ELEANOR PRATT
and TERRY TIECHROW, individually and in
their official capacities as members of the
Montana Public Employees' Retirement Board,

      Defendants.

**FILED**

AUG 24 1995

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

ORIGINAL  PROCEEDING

COUNSEL OF RECORD:

        For Plaintiff:

            Thomas K. Hopgood; Luxan & Murfitt, Helena,
            Montana

            Patrick F. Hooks, Attorney at Law, Helena,
            Montana (argued)

        For Defendants:

            Kelly A. Jenkins, Special Assistant Attorney
            General, Montana Department of Administration,
            Helena, Montana (argued)

                      Submitted:  April 11, 1995

                      Decided:  August 24, 1995

Filed:

_____
      Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

By order dated October 31, 1994, and pursuant to Rule 44, M.R.App.P., the United States District Court, District of Montana, certified the following question of law to this Court for consideration and decision:

> Does the benefit increase provided for in Chapter 664, Laws of 1989, an amendment to § 19-5-502, MCA, which became effective on July 1, 1991, apply to members of the Montana Judges' Retirement System who retired after the date of enactment but prior to the effective date of the legislation?

We accepted jurisdiction of the certified question by order dated November 15, 1994, and stated that we would decide the certified question on the basis of the statement of facts contained in the federal court's Certification of Question of Law, as well as the Record described in the Certification. We hold that the referenced benefit increase does not apply to members of the Montana Judges' Retirement System who retired after the enactment, but before the effective date, of the legislation and, therefore, answer the certified question in the negative.

The facts contained in the Certification, and upon which our decision is based, are as follows:

L. C. Gulbrandson (Gulbrandson), an Arizona resident, was an active member of the Montana Public Employees' Retirement System (PERS) and, subsequent to its creation, Judges' Retirement System (JRS) from January 4, 1960 through August 31, 1989. For service as a district court judge and supreme court justice during this period, Gulbrandson was credited with 29 years and 8 months of

2

service credit in JRS. Since September 1, 1989, Gulbrandson has been a retired member of JRS.

Carole Carey, Eleanor Pratt, Terry Tiechrow, Troy McGee, Sr., Fred Flanders, and Carol Lambert are Montana residents appointed by the governor to the Public Employees' Retirement Board (Board), pursuant to § 2-15-1009, MCA. The Board is charged under Montana law, Title 19, MCA, with the administration of JRS, among other state administered governmental retirement systems.

During Gulbrandson's period of active membership on the bench in PERS, from January 4, 1960, through June 30, 1967, he contributed 5.6% of his salary to PERS. On July 1, 1967, JRS was formed as a retirement system separate from PERS. All Gulbrandson's service credit in PERS was transferred to JRS. From July 1, 1967, through August 31, 1989, Gulbrandson contributed 6% of his salary to JRS.

During the 51st Montana Legislature which convened in January 1989, Senate Bill 241was introduced by Senator Mazurek and others. This bill, as introduced, provided for additional state funding to JRS and provided for an increase in retirement benefits for those years served by a Judge after the 15th year from 1% to 2% of final salary for each such year of service.

This bill, as amended, was signed by the Governor of Montana on May 13, 1989, and enrolled as Chapter 664, Laws of 1989 (Ch. 664). As enacted, Ch. 664 was effective on July 1, 1989, except for two sections which were to be effective on July 1, 1991. The more pertinent of these delayed-effect sections, Sec. 3, provided

3

as follows:

> Section 19-5-502, MCA, is amended to read:
> Upon retirement from service, a member shall receive a service retirement allowance which shall consist of the state annuity plus the member's annuity. The member's annuity shall be the actuarial equivalent of his aggregate contributions at the time of retirement. The state annuity shall be in an amount which, when added to the member's annuity, will provide a total retirement allowance of 3 1/3% per year of his final salary for the first 15 years' service and 1.785% per year for each year's service after 15 years' service.

Sec. 3, Ch. 664 was one of two sections of that legislation which had a delayed July 1, 1991, effective date. The remainder of the legislation, including a mechanism for increased state funding for JRS, was effective July 1, 1989.

Gulbrandson was an active member of JRS at the time of the legislative enactment and for more than three months beyond enactment. As an active member during this time, Gulbrandson continued to contribute 6% of his salary to JRS.

Had he completed his term, Gulbrandson's term of office would have expired January 6, 1991. Gulbrandson resigned voluntarily on August 31, 1989.

Beginning September 1, 1989, Gulbrandson began to receive "a total retirement allowance of 3 1/3% per year of his final salary for the first 15 years' service and 1% per year for each year's service thereafter," as provided in § 19-5-502, MCA, on that date. Gulbrandson has continued to receive a total retirement allowance based on these percentages.

Between May 13, 1989, and July 1, 1991, there were 6 active members of JRS with more than 15 years of service. Gulbrandson was

4

the only member with more than 15 years of service who voluntarily terminated service during that period.

On January 23, 1992, Gulbrandson appeared before the Board informally seeking Board consideration of the application of Sec. 3, Ch. 664, initially as to all members retired prior to July 1, 1991, then as to himself. The Board requested an Attorney General's Opinion on the issues.

On December 4, 1992, the Attorney General of Montana issued an opinion to the Board which concluded that Ch. 664 did not increase the retirement allowance for those JRS members who retired prior to July 1, 1991, even those who retired after the date of enactment.

On September 13, 1993, Gulbrandson filed a formal petition with the Board for redetermination of his retirement allowance. The Board denied the petition on September 23, 1993.

Members of JRS with more than 15 years of service credit who retired after July 1, 1991, have received "a total retirement allowance of 3 1/3% per year of his final salary for the first 15 years ' service and 1.785% per year for each year's service after 15 years' service," as provided in § 19-5-502, MCA, after that date.

Jack L. Green, a JRS member active from May 1, 1963, through December 31, 1992, with 29 years, 8 months service credit in JRS, has at all times received a total retirement allowance based on 1.785% of final average salary for all years subsequent to his 15th year of service.

1. Is Gulbrandson entitled to the increased retirement

5

benefit provided in Section 3, Chapter 664, Laws of 1989, amending § 19-5-502, MCA, which was enacted in 1989 and effective July 1, 1991, under the plain language of the statute?

Our function in construing and applying statutes is to effectuate the legislature's intent. United States v. Brooks (Mont. 1995), 890 P.2d 759, 761, 52 St.Rep. 113, 114. To determine legislative intent, we first look to the plain meaning of the words used in the statute. Stansbury v. Lin (1993), 257 Mont. 245, 249, 848 P.2d 509, 511. If the legislature's intent can be determined by the plain language of the words used, we may not go further and apply other means of interpretation. Prairie County Co-op v. Kalfell Ranch, Inc. (Mont. 1994), 887 P.2d 241, 246, 51 St.Rep. 1488, 1491. It is only when the intent cannot be determined from the language of the statute that we will examine legislative history. Matter of Kalfell Ranch, Inc., 887 P.2d at 246.

As of its effective date on July 1, 1991, Section 3, Chapter 664 provides an increased retirement benefit to JRS members with more than 15 years' service "upon retirement from service." The plain meaning of the statutory language is that a member is entitled to the increased benefit upon his or her retirement from service on or after July 1, 1991. Such plain, clear and unambiguous language expresses the legislature's intent and permits no further interpretation by this Court. Matter of Kalfell Ranch, Inc., 887 P.2d at 246.

Here, Gulbrandson retired from service nearly two years before the effective date of Section 3, Chapter 664. He did not retire

again on or after July 1, 1991. Based on the plain meaning of the statute, we conclude that he was not entitled to the increased retirement benefit contained in § 19-5-502, MCA, as amended by Chapter 664, upon his retirement prior to July 1, 1991.

Gulbrandson argues that denial of his entitlement to the increased retirement benefit impermissibly impairs his contract with the JRS in violation of Article II, section 31, of Montana's Constitution. Under the three-part test we apply to determine whether legislation violates the impairment of contracts clause, the initial inquiry is whether the law has operated as a substantial impairment of the contract. Matter of Yellowstone River (1992), 253 Mont. 167, 182-83, 832 P.2d 1210, 1219 (citations omitted). Thus, in order to address Gulbrandson's argument, we must determine the parameters of his contract to determine whether the contract guarantees him the benefit increase contained in Section 3, Chapter 664. If it does not, then denial of the increased retirement benefit cannot impair the contract.

At the **time** of Gulbrandson's retirement prior to the effective date of Section 3, Chapter 664, JRS members with more than 15 years' service were entitled to 1% per year of current salary for each year of service after 15 years. See § 19-5-502, MCA (1989). This clear and undisputed entitlement is our starting point in determining the **terms** of Gulbrandson's retirement benefit contract.

Gulbrandson argues that the entirety of Chapter 664 became operable law as of May 13, 1989, when it was signed by Governor Stan Stephens. Accordingly, and notwithstanding the delayed

7

effective date of the Section 3 amendment to § 19-5-502, MCA, he asserts that his entitlement to the increased retirement benefit contained in Chapter 664 became a vested part of his contract as of May 13, 1989. He relies, in part, on Leonard v. City of Seattle (Wash. 1972), 503 P.2d 741. Leonard does not support his position.

In Leonard, the Washington Supreme Court considered whether a retired police officer's pension could be forfeited under a statute enacted after the officer's retirement which forfeited pension rights upon a felony conviction. The court refused to allow the forfeiture, stating that rights to a public pension "are to be determined as of the latest enactments applicable to the recipient in effect prior to actual retirement . . . ." Leonard, 503 P.2d at 747. Applying the Leonard language here, it is clear that the latest enactment applicable to Gulbrandson which was in effect prior to his retirement was § 19-5-502, MCA (1989), because Section 3, Chapter 664 was not effective until July 1, 1991.

Nor is Gulbrandson's reliance on 73 Am. Jur. 2d Statutes § 360 (1974), well placed. The portion of that discussion on which he relies centers on whether a bill becomes law on passage by the legislature or only upon approval by the governor; that is not the issue presently before us. We note that Gulbrandson does not quote a later part of the discussion which points out that legislatures often are authorized to prescribe the time when a statute takes effect. 73 Am.Jur. 2d Statutes § 360 (1974). That is precisely what the Montana legislature did here.

The terms of Gulbrandson's retirement benefit contract are

determined pursuant to the statutes in effect at the **time** of his **retirement on** August 31, 1989. The amendment to § 19-5-502, MCA, via Section 3, Chapter 664, was not yet effective on that date. Therefore, we conclude that Gulbrandson's contract does not include the increased retirement benefit contained in Section 3, Chapter 664 and, as a result, his contract was not impaired by denying him entitlement to that increased benefit.

    2. Does the denial of the increased retirement benefit contained in Section 3, Chapter 664, violate Gulbrandson's constitutional right to the equal protection of the law?

Gulbrandson argues that the Board's interpretation and application of Section 3, Chapter 664 creates impermissible classifications of JRS retirees and singles him out based on his retirement between the date the governor signed Chapter 664 and the effective date of Section 3 thereof. His stated equal protection challenge is to the amended statute as applied by the Board, rather than to the statute by its **terms,** and is based on his contention that he is entitled to the increased retirement benefit pursuant to § 19-5-502, MCA, as amended. Because we conclude above that Gulbrandson is not entitled to the increased retirement benefit under the plain meaning of the amended statute, we deem his equal protection argument to be directed at the provisions of the amended statute, that is, a facial challenge to the law itself.

Article II, section 4 of the Montana Constitution provides that "[n]o person shall be denied the equal protection of the

9

laws." The purpose of the equal protection clause "is to ensure that persons who are citizens of this country are not the subject of arbitrary and discriminate state action." Cottrill v. Cottrill Sodding Service (1987), 229 Mont. 40, 42, 744 P.2d 895, 897; quoting Godfrey v. Mont. State Fish & Game Com'n (1981), 193 Mont. 304, 306, 631 P.2d 1265, 1267. We determine whether state action violates equal protection by applying either a strict, intermediate or rational basis standard of scrutiny. The determination of which standard is appropriate depends on the facts and the rights involved. See Arneson v. State (1993), 262 Mont. 269, 272-73, 864 P.2d 1245, 1247-48; Cottrill, 744 P.2d at 897.

The most stringent standard, strict scrutiny, is imposed when the action complained of interferes with the exercise of a fundamental right or discriminates against a suspect class. Eastman v. Atlantic Richfield Co. (1989), 237 Mont. 332, 337-38, 777 P.2d 862, 865. The intermediate standard is applied in cases involving rights that are significant, or important, but not fundamental. Butte Community Union v. Lewis (1986), 219 Mont. 426, 432-34, 712 P.2d 1309, 1312-14. The lowest standard, the "rational basis" or "reasonable relationship" test, applies in most cases. To withstand rational basis scrutiny, the law or state action need be only rationally related to furthering a legitimate state purpose. Arneson, 864 P.2d at 1248.

With regard to the proper standard of scrutiny for this case, Gulbrandson makes a passing argument that intermediate scrutiny applies. He does not, however, distinguish our decision in

10

<u>Arneson</u>, where we rejected intermediate scrutiny in favor of the rational basis standard in the context of an equal protection challenge to retirement benefit statutes. <u>Arneson</u>, 846 P.2d at 1248. Consequently, we analyze Gulbrandson's claim under the rational basis test.

To a certain extent, nearly all legislation sets forth classifications regarding applicability, benefits and recipients; the fact that some of these classifications are imperfect does not necessarily mandate a conclusion that they violate the equal protection clause. <u>Arneson</u>, 864 P.2d at 1248. Moreover, every possible presumption must be indulged in favor of the constitutionality of a challenged statute. <u>Arneson</u>, 864 P.2d at 1248; citing State v. Safeway Stores (1938), 106 Mont. 182, 199, 76 P.2d 81, 84.

Section 19-S-502, MCA, as amended by Section 3, Chapter 664 effective July 1, 1991, created two classes of retired judges, with those retiring after that date receiving an increased retirement benefit for years of service in excess of 15 years. The issue before us is whether a rational relationship exists between the delayed effective date of Section 3, Chapter 664, which results in Gulbrandson's lack of entitlement to the increased retirement benefit, and a legitimate government interest. <u>See</u> <u>Arneson</u>, 846 P.2d at 1248-49.

The factual and legal equal protection issues in this case are similar to those addressed by the Michigan Supreme Court in Hughes v. Judges Retirement Bd. (Mich. 1979), 282 N.W.2d 160. In <u>Hughes</u>,

11

two retired judges instituted an action for a writ of mandamus increasing their retirement benefits under a 1974 amendment to the retirement system; both judges had retired before the effective date of the amendment. The writ was denied and the judges appealed. Hushes, 282 N.W.2d at 162-63.

Applying the rational basis test, the Michigan Supreme Court quoted earlier cases stating that "legislation is not unconstitutional because . . . it benefits a particular class, so long as the law operates equally upon those within a particular class." Hushes, 282 N.W.2d at 167 (citations omitted). The court first concluded that the legislature did not intend to provide the increased benefit to judges retiring prior to the effective date of the retirement system amendment. It then discussed the purpose of the 1974 amendment at issue, which was to induce judges to remain in service as judges. Given that purpose and the fact that no incentive to remain on the bench can be offered to a judge who has already retired, the "distinction created between judges who retire prior to the amendment and those who retire after the amendment is [not] arbitrary, unreasonable, or devoid of rational basis." Hucrhes 282 N.W.2d at 168. On that basis, the Michigan court held that the classification created by the amendment was "rationally related to the object of the legislation in which it is made." Hughes, 282 N.W.2d at 168. The Hughes rationale is equally applicable here.

On its face, as discussed above, the delayed effective date of the amendment to § 19-5-502, MCA, establishes the legislature's

12

intent to provide the increased retirement benefit to those judges retiring on or after the July 1, 1991, effective date. The fact that the amendment created two classifications does not produce an equal protection violation; to this extent, the delayed-effect amendment is not unlike most legislation which, by its very nature, contains or produces classifications regarding benefits, applicability and the like by virtue of a change in statute at a particular point in time. See Arneson, 864 P.2d at 1248.

Moreover, there is no dispute that the classification created by the amendment "operates equally upon those within the particular class." See Hushes, 282 N.W.2d at 167. All judges who retired prior to July 1, 1991, receive the retirement benefits to which they were statutorily entitled at the time of their retirement; those who retired after July 1, 1991, also receive the retirement benefits to which they were statutorily entitled at the time of their retirement, including the increased benefit provided as of that date via Section 3, Chapter 664.

In addition, as was the case in Hushes, one of the purposes of Section 3, Chapter 664, even before the effective date was delayed, was to provide an incentive to judges to remain in service by increasing their retirement benefit for years of service in excess of 15 years; indeed, the delayed effective date can be viewed as an additional inducement in that judges with significant numbers of years of service might be encouraged to remain in service not merely until the July 1, 1991, effective date, but for some time thereafter. There is no question but that the purpose of the

13

amendment, including the delayed effective date, is a legitimate governmental interest. Given the stated purpose, and the fact that the incentive to remain on the bench cannot be successful with regard to judges retiring prior to its effective date, we cannot say that the distinction between judges retiring prior to, and after, the effective date of the amendment is in any way arbitrary, unreasonable or devoid of rational basis. See Hughes, 282 N.W.2d at 167-68.

Gulbrandson advances an argument that the distinction at issue relates not to when a judge retires, but to equality of retirement benefits among judges with similar years of service. He compares his own situation to that of retired district court judge Jack Green, who retired December 31, 1992. At the time of their respective retirements, each was credited with 29 years and 8 months of service. With regard to the amount of retirement benefit received for years of service in excess of 15 years, Judge Green received 1.785% per year, while Gulbrandson received 1% per year.

The fatal flaw in this comparison relates to our discussion regarding the plain meaning of § 19-5-502, MCA, as amended; namely, that the amount of retirement benefit to which a member of the JRS is entitled is calculated pursuant to the statutes in effect at the time of the retirement. When Gulbrandson retired, § 19-5-502, MCA (1989), entitled him to 1% of current salary per year for each year of service exceeding 15 years. Judge Green, on the other hand, retired well after the effective date of the amendment to § 19-5-502, MCA, and, therefore, was entitled to the increased retirement

14

benefit which became effective on July 1, 1991. While this difference in benefit entitlement between retiring judges with identical periods of service may be less than perfect, such imperfection does not mandate a conclusion that it violates Gulbrandson's right to equal protection of the laws. See Arneson, 864 P.2d at 1248. In addition, relative to our discussion of the purpose of the amendment, that purpose was furthered by Judge Green's remaining in service after its effective date; it could not have been furthered by Gulbrandson, who retired prior to eligibility for the increased retirement benefit.

We conclude that § 19-5-502, MCA, as amended by Section 3, Chapter 664, is not unreasonable or arbitrary. We further conclude that it is rationally related to a legitimate governmental interest in providing an incentive for judges remaining in service for longer periods of time.

We hold that the retirement benefit increase provided in Section 3, Chapter 664, Laws of 1989, an amendment to § 19-5-502, MCA, which became effective on July 1, 1991, does not apply to members of the Montana Judges' Retirement System who retired after the enactment date, but prior to the effective date, of the legislation. Therefore, we answer the certified question in the negative.

_____
Justice

15

We concur.

_____
Chief Justice

_____

_____
Justices

16

Chief Justice J. A. Turnage respectfully dissents.

The majority opinion correctly states that this Court's function is to determine the legislature's intent in the passage of a statute. The majority then goes on to say that based on the plain language of the statute Retired Justice L. C. Gulbrandson is not entitled to the benefits of § 19-5-502, MCA, as amended by Chapter 664 of the 1989 Montana Session Laws.

Resorting to this method of judicial analysis ignores a long history of § 19-S-502, MCA, and Chapter 664 of the Session Laws of 1989. This Court's resorting to the "plain language" analysis affords an easy solution to the issue before this Court, neat, plausible and wrong.

To arrive at a just and correct solution of the issue before this Court it is absolutely necessary to fully understand the history and political maneuvering that underlies the 1989 amendment to § 19-5-502, MCA. Failure to do so can only result in a denial of justice and fairness in this case.

For several years, the Montana Judges' Retirement System had been the focus of certain actuarial consultants and personnel of the Montana Public Employees' Retirement System who consistently proclaimed that the Judges' Retirement System was under-funded. I respectfully submit that the following factual information set forth herein clearly establishes that for more than ten years last past and presently, the System is not under-funded. The following information obtained from the records of the Public Employees' Retirement Board are most interesting and factually important.

17

## STATE OF MONTANA
## JUDGES' RETIREMENT SYSTEM

### ADDITIONS TO NET ASSETS AVAILABLE FOR BENEFITS

| FISCAL YEAR | REVENUE% | EXPENSES | ANNUAL ADDITIONS | NET ASSETS AVAILABLE |
|---|---|---|---|---|
| 06/30/85 | 1,486,109 | 420,788 | 1,065,321 | 6,614,467 |
| 06/30/86 | 1,606,206 | 451,163 | 1,155,043 | 7,769,510 |
| 06/30/87 | 1,678,660 | 442,168 | 1,236,492 | 9,006,002 |
| 06/30/88 | 1,653,856 | 453,033 | 1,200,823 | 10,206,825 |
| 06/30/89 | 1,829,743 | 465,282 | 1,364,461 | 11,571,286 |
| 06/30/90 | 1,984,100 | 613,484 | 1,370,616 | 12,941,902 |
| 06/30/91 | 2,065,536 | 580,088 | 1,485,448 | 14,427,350 |
| 06/30/92 | 2,169,853 | 667,957 | 1,501,896 | 15,929,246 |
| 06/30/93 | 2,409,254 | 802,217 | 1,607,037 | 17,536,284 |
| **06/30/94** | **2,552,411** | 749,612 | **1,802,739** | **19,339,023** |

It is important to note that actuarial consultants have indulged certain assumptions that are not supported by logic or the facts or the actuary has failed to take into consideration certain other relevant and very important facts concerning judges' retirement. For example:

(1) Assumption that the rates of salary increase for judges are based upon an assumed compounded growth rate of 6.5 percent per annum. If such were the case, Montana judges certainly would not be the lowest paid judges in the nation. If the actuary was correct, Montana district judges commencing January 1, 1995, would be receiving a salary of $98,309 annually, or $35,131 more than they are actually receiving.

(2) Another actuarial assumption is that the obligation of the pension reserves must be adjusted to present value which, of course, assumes that every judge will retire tomorrow and there

18

never will be any further contributions made to the system from all of the present revenue sources and that all of the present value obligations would have to be paid out on the same date.   This assumption, although with due respect may be a standard actuarial approach, simply defies logic for the reason that it cannot and will not ever occur.

(3) A relevant fact that should be considered by the actuary in making assumptions is the fact that judges are not entitled to draw normal retirement until they have reached the age of sixty-five years.   This requirement does not apply to any other public employee system in the State of Montana.   The result of such requirement is, of course, that judges, when they do commence to draw retirement, are at a relatively advanced age and based on the mortality tables cannot expect to draw their retirement for any extended number of years.   A review of the retirement board records relating to deceased judges will most certainly bear out this fact of life.

(4) It does not appear that the actuary has taken into account that many of the present judges are entering the system at a much earlier age and contributions will be made by them and the employer for an extended period of time that statistically did not take place in years past.   These judges, of course, will also be required to wait before receiving any benefit from the system under normal retirement until they have reached the age of sixty-five years.

From the foregoing revenues and expenses from June 30, 1985, to June 30, 1994, it is readily apparent that revenues have been exceeding expenses by over three times annually and that the annual additions to and growth of the fund assets are exceeding well over $1,000,000 in each of those ten years. The net assets of the Judges' Retirement System will, of course, continue to grow at the experienced rate or in excess thereof. With prudent investment of the funds, this system will be in a position to loan money to the United States of America to bail out its Social Security System in a few more years.

What does this history of the System's revenues and expenses have to do with the issue in this case? Everything.

This inquiry leads us to the history of what is now § 19-5-502, MCA, as amended by Chapter 664 of the Montana Sessions Laws of 1989. Prior to the 1987 session of the Montana legislature, it was apparent that there was an unfairness in the Judges' Retirement System. What is now § 19-5-502, MCA, from the inception of the System, penalized judges who had served fifteen years by reducing their retirement benefits to 1 percent credit for each year of service after fifteen years. This reduction was far below the annual service credit for the first fifteen years of service and was nearly twice lower than the annual service credit of public employees in the state. In an attempt to bring some equity into this situation, there was introduced Senate Bill 365 in the 1987 session which would have raised the 1 percent annual credit after fifteen years to 2 percent. Senate Bill 365 was heard in the

Senate and House Committees. During the hearings, it was evident that personnel of the Public Employees' Retirement System succeeded in alarming the committee members that the Judges' Retirement System was in great jeopardy and under-funded. Please note, for each of the fiscal years ending June 30, 1986, and June 30, 1987, the net assets of the funds had increased by well over $1,000,000 for each of those years. The net result was that the House of Representatives failed to approve the Bill and the Bill died, notwithstanding the fact that the Bill carried with it a funding mechanism to increase contributions to the Judges' Retirement System over and above any anticipated additional expenses by virtue of the increased service credit.

It was apparent during the 1987 legislative hearings that certain members of the legislature were of a mind that any legislation that benefited judges was not going to meet with their approval. Unfortunately, this carried over into the 1989 session.

During the 1989 session, Senate Bill 241 was introduced and is now Chapter 664 of the 1989 Montana Session Laws. It amended § 19-5-502, MCA, into its present form.

Senate Bill 241 contained a funding provision which more than exceeded any cost to the system by raising the service retirement credit from 1 percent to 2 percent. In spite of the written **testimony** of the Public Employees' Retirement Division Administrator that the Board did not oppose Senate Bill 241 and that it did provide a method of funding that more than off-set any of its costs, the Division persisted in claiming that the Judges'

21

Retirement System was under-funded in spite of the fact that for the fiscal year June 30, 1988, the additions to the retirement assets increased by well over $1,000,000 and on June 30, 1989, the assets increased by $1,364,461.

The House Committee on State Administration held hearings on the Bill and again, in spite of the system not opposing the Bill, a representative of the Public Employees' Retirement Division went into great length in again raising fears of under-funding of the judges' retirement system. It was apparent that the usual opponents to any legislation that would benefit the judiciary was again arguing that the Judges' Retirement System was under-funded and the Committee initially refused to approve the Bill on a tie vote and the Bill was tabled. Thereafter, political maneuvering obviously took place and the Bill was taken off of the table, amended and passed with the increased annual service credit benefit reduced from 2 percent to 1.785 percent, the same as other public employees of the State of Montana were receiving. The most significant amendment to Senate Bill 241, and which clearly evidences political maneuvering that would make Machiavelli blush, is found in what then appeared as section 5 of the Bill, and which section does not appear in our Montana Code Annotated, reads as follows:

> Section 5. Review of actuarial valuation. The public employees retirement board shall provide to the 52nd legislature, by January 10, 1991, a copy of the most current actuarial valuation of the judges' retirement system. The legislature shall review the actuarial soundness of the judges' retirement system, and the 52nd legislature may eliminate or modify the effect of [this act].

22

The obvious purpose of the legislators who were not particularly supportive of the judiciary in offering this amendment certainly cannot be attributed to a factual fear of under-funding of the Judges' Retirement System in view of the fact that the System had been growing with excess revenues over expenses at well over $1,000,000 per year for several years prior to the 1989 legislative session. It is apparent that the opponents of the Bill included this amendment for the purpose of having the Bill before them again in the 1991 legislative session when they could effectively repeal the 1989 increased service credit benefit. In any event, certain of the opponents to this Bill did not return to the 1991 legislative session and there was no effort to repeal the increased service benefits.

The foregoing basic facts are all set forth in the appendix to plaintiff's brief and are a part of the record in this case. Such facts support the observations of the undersigned.

With the foregoing in mind, it is obvious that the legislative intent behind what is now Chapter 664 of the Montana Session Laws of 1989 cannot be determined by simply looking at the bare wording of Senate Bill 241.

In this Court's search for justice, it would be unwise to dispose of this case based on a plain language doctrine.

There is a further point that gives rise to the necessity of interpreting the legislative intent in this manner. If, as claimed by the majority, that section 3 of Chapter 664 is only to be effective on July 1, 1991, this raises a substantial question as to

23

whether or not any portion of section 3 of the Act, which is the entirety of § 19-5-502, MCA, likewise is not to be effective until July 1, 1991. If such be the case, for a two-year period from July 1, 1989, to July 1, 1991, no member of the Judges' Retirement System could receive any credit for those two years of service. Such "plain language" approach technically could lead to an absurd result that the majority would likely disavow.

It should be noted that major portions of Senate Bill 241 became effective July 1, 1989, particularly those portions that provided additional monies to the Judges' Retirement System.

If the legislature clearly intended that no judge retiring prior to July 1, 1991, would be entitled to any of the .785 percent service credit retirement, they simply could have stated in the amendment to § 19-5-502, MCA, the following: "No judge retiring prior to July 1, 1991, shall be entitled to the increased service credit of .785 percent per year for each year of service after fifteen years." If such was their intent, they could have easily made that additional statement, thereby avoiding the underlying litigation and the necessity for this Court to interpret legislative intent.

It must also be noted that Retired Justice Gulbrandson is not seeking the increased service credit benefit from the effective date of the act, July 1, 1989, but only from the July 1, 1991, when the increased service credit became effective. Retired Justice Gulbrandson is the only retired person that could possibly be or has been affected by the July 1, 1991, effective date of the

24

increased service credit. He is the only member of the Judges' Retirement System with more than fifteen years service credit that retired between July 1, 1989, and July 1, 1991. He is entitled, prospectively, to the benefit of the act increasing the service credit effective July 1, 1991. Denying him the benefit of Senate Bill 241 for an increased service credit commencing July 1, 1991, which is what Retired Justice Gulbrandson is requesting, does not involve a retroactive request for benefits--only a prospective right to those benefits subsequent to July 1, 1991.

Denial of the prospective benefits subsequent to July 1, 1991, violates Retired Justice Gulbrandson's rights secured under the Contracts Clause, Article I, Section 10, Clause 1, of the United States Constitution. On September 10, 1989, when Retired Justice Gulbrandson concluded his judicial career, Senate Bill 241 had been law since it was approved by the Governor on May 12, 1989. The basic effective date of the act had been law since July 1, 1989. Therefore, Retired Justice Gulbrandson had a constitutionally-protected contract right to rely upon the benefits that are due him under the act before he retired.

Retired Justice Gulbrandson has also been denied equal protection of the law as guaranteed under the Fourteenth Amendment to the United States Constitution, which classifies him in such a manner as to make the classification arbitrary and capricious. Even under the reduced rational basis test of equal protection, the State cannot demonstrate any legitimate rational purpose in denying

25

the prospective benefits based upon the clear record of the assets of the Judges' Retirement System.

Of the nearly one hundred past and present members of the Judges' Retirement System, Retired Justice Gulbrandson is the only person that could possibly be affected by § 19-5-502, MCA. No other person retired between the approval date of the act, May 12, 1989, and July 1, 1991. The denial of benefits to Retired Justice Gulbrandson simply cannot set any precedent, affect any other person and like **circumstances** simply will never again reoccur.

Retired Justice Gulbrandson served the people of Montana with dedication, diligence and ability for twenty-three years as District Judge of the Seventh Judicial District and for six years and eight months as a Justice of the Montana Supreme Court--a total of twenty-nine years and eight months of judicial service.

During Justice Gulbrandson's service as a District Judge in the Seventh Judicial District from January 4, 1960, to January 2, 1983, he was the only judge serving the District that comprised the Counties of Richland, Dawson, McCone and Wibaux. During much of that **time** this judicial district was experiencing a judicial explosion because of an oil development boom that prevailed during nearly all of that period of time. It is ironic that after all of those years L. C. Gulbrandson provided judicial service to the Seventh Judicial District as the lone district judge thereof, the legislature in 1984, the year that Retired Justice Gulbrandson assumed his seat on the Montana Supreme Court, increased the number

26

of judges in the Seventh Judicial District by adding an additional judge.

There is ample precedent that pension statutes should be liberally construed in favor of the persons intended to be benefited thereby and examined in their entirety to determine the legislative intent. Such laws must be construed equitably in the interest of the state and the employee and applied so as not to achieve an unreasonable result. 67 C.J.S. Officers § 243.

The Public Employees' Retirement Board was arbitrary and wrong in denying Retired Justice L. C. Gulbrandson, prospectively, the service credit benefits after July 1, 1991.

The certified question cannot be simply answered by a "plain language" analysis. To do so, would result in a denial of justice.

I would answer the certified question of the United States District Court by stating that the benefit increase provided for in Chapter 664, Laws of 1989, an amendment to § 19-5-502, MCA, provides its benefit prospectively to Retired Justice L. C. Gulbrandson from July 1, 1991.

Answering the certified question in this manner is a fair, just and correct interpretation of legislative intent.

As judges, we should make no judgments where there is no fairness or compassion.

I wish to also note that the legislature subsequently amended § 19-5-502, MCA, by Section 103 of Chapter 265, Laws of 1993. This amendment, effective July 1, 1993, obviously repealed Section 3 of

27

Chapter 664, Laws of 1989, by rewriting § 19-5-502, MCA. It now reads:

> Service retirement benefit. Upon retirement from service, a member must receive a service retirement benefit equal to 3 1/3% per year of the member's current salary for the first 15 years of credited service and 1.785% per year for each year of credited service after 15 years.

In so amending § 19-5-502, MCA, the legislature obviously has repealed the version that was enacted as Chapter 664, Laws of 1989. Therefore, the effective dates contained in Chapter 664, Laws of 1989, relating to § 19-5-502, MCA, no longer apply

The statute, as enacted in Chapter 265 Laws of 1993, by the plain language thereof, states that a member (retired district judge or justice) is entitled to a service retirement benefit of 1.785% per year for each year of credited service after fifteen years.

This includes Retired Justice Gulbrandson and other retired members of the system.

Even though I believe him to be entitled to the increased service credit from July 1, 1991, in all events, Retired Justice L. C. Gulbrandson would be entitled to this benefit from July 1, 1993.

_____
Chief Justice

Justice Fred J. Weber joins in the foregoing dissent.

_____
Justice

28

Justice Fred J. Weber dissents as follows:

I respect the careful analysis in the opinion which concluded that a judicial member is entitled to the increased benefits only if he or she retired on or after July 1, 1991. I do disagree with the fundamentals upon which the analysis is made. I join in the dissent of Chief Justice J.A. Turnage.

I conclude it is essential to carefully analyze the Act itself. Chapter 664 contained the following words: "Be it enacted by the Legislature of the State of Montana." This met the enacting requirements of § 5-4-101, MCA. Chapter 664 was approved by the Governor on May 12, 1989. This met the requirements of § 5-4-302, MCA, with regard to approval by the Governor. The result is that the entire Chapter 664 became law on May 12, 1989

The title to Chapter 664 stated:

AN ACT GENERALLY REVISING THE JUDGES' RETIREMENT SYSTEM; REALLOCATING THE DISTRIBUTION OF DISTRICT COURT FEES TO MAINTAIN THE ACTUARIAL SOUNDNESS OF THE SYSTEM; INCREASING THE PERCENTAGE OF SALARY USED TO CALCULATE A MEMBER'S SERVICE RETIREMENT ALLOWANCE AFTER 15 YEARS OF SERVICE IN THE SYSTEM; AMENDING SECTIONS 19-5-404, 19-5-502, AND 25-1-201, MCA; AND PROVIDING EFFECTIVE DATES. (Emphasis added.)

In summary the title shows that the Act generally revised the Judges' Retirement System, reallocated district court fees to maintain actuarial soundness, increased percentage of salary for member's service retirement allowance after 15 years, amended code sections with regard to fees and finally provided effective dates. The title indicates that the intent of the legislature was to increase the percentage used to calculate a judge's retirement after 15 years service.

29

I will next consider the seven sections which make **up Chapter** 664. Section 1, amended § 19-S-404, MCA, to provide that the portion of the fee for filing a dissolution of marriage and a motion for substitution of a judge shall be transmitted by the clerk of district court to the State. I do point out that § 19-5-404, MCA, includes provisions for the transmission of other fees, none of which were amended. Note that Section 1 became effective July 1, 1989, so that the described fees were transmitted to the State commencing on that date.

Section 2, provided that the same § 19-5-404, MCA, was amended to provide that the State was required to first deposit in the retirement fund an amount equal to 34.71% of the salaries paid to district court judges and supreme court justices--prior to this amendment, the amount was equal to 31% of such salaries. Note that this requirement for the increased payment by the State to the fund was effective July 1, 1991.

Section 3, contained the amendment that upon retirement from service the State annuity plus the member's annuity will provide a total retirement allowance of 3 1/3% per year of a judge's final salary for the first 15 years' service and 1.785% per year for each year's service after 15 years. Prior to its amendment, the amount after 15 years was 1%. This Section 3 is stated to become effective July 1, 1991, and is the primary section at issue in this case.

Section 4, provides for amendments in § 25-l-201, MCA, which provides that of the fee for filing a petition for dissolution of marriage, $35 must be remitted to the State to be deposited as

30

**provided** in § 19-5-404, MCA; and further provides that the fee for filing a motion for substitution of judge must be remitted to the State to be deposited as provided in § 19-5-404, MCA. Again note that this Section 4 took effect on July 1, 1989, so those fees were remitted to the State following that date.

Section 5, provides as follows:

Review of actuarial valuation. The public employees retirement board shall provide to the 52nd legislature, by January 10, 1991, **a** copy of the most current actuarial valuation of the judges' retirement system. The legislature shall review the actuarial soundness of the judges' retirement system, and the 52nd legislature may eliminate or modify the effect of [this act].

Section 5 also became effective July 1, 1989. I emphasize that the 52nd Legislature in 1991 did not eliminate or modify the effect of Chapter 664

Section 6, pertains to rule-making authority which is not pertinent here.

Section 7, provided:

**Effective dates.** (1) Except as provided in subsection (2), [this act] is effective July 1, 1989.
(2) [Sections 2 and 31 are effective July 1, 1991.

In substance this provides that the Act is effective July 1, 1989, with the exception of Sections 2 and 3 which are effective July 1, 1991.

The opinion concludes that as of the effective date of July 1, 1991, Section 3 of the Act provides an increased retirement benefit to judges with more than 15 years' service "upon retirement from service." The opinion then concludes that the plain meaning of the statutory language is that a member is entitled to the increased benefits upon retirement from service on or after July 1, 1991.

31

The opinion concludes that the foregoing is the plain, clear and unambiguous language expressed by the legislature as to its intent and permits no further interpretation. I do not agree with that analysis.

When Chapter 664 is considered in its entirety, it explains the reason for the different effective dates. In its reallocation of district court fees to maintain actuarial soundness, Section 5 provided that the Retirement Board should provide to the legislature a current actuarial valuation of the retirement system and specifically required that the legislature review the actuarial soundness and granted to the 1991 Legislature the right to eliminate or modify the effect of this Act. Note that the additional fees were collected for retirement fund purposes commencing July 1, 1989, so that such fund payments were made for two years. I note here that the figures contained in Chief Justice Turnage's dissent show that the June 30, 1988 figures, which would have been available to the 1989 Legislature, demonstrated net assets available of $10,206,825. The 1991 Legislature would have had available the June 30, 1990 figures, which showed net assets available of $12,941,902, an increase of over $2,700,000 in two years. On its face this suggests the actuarial soundness of the fund and demonstrates a reason for the 1991 Legislature not eliminating or modifying the effect of Chapter 664.

The opinion concludes that the plain meaning of the statutory language is that a judge is entitled to increased benefits only if he retired from service on or after July 1, 1991. In substance, that seems to be a conclusion that Section 3 of the Act had

32

absolutely no effect until July I, 1991. I cannot agree with such a conclusion. Section 3, with its provision of 1.785% per year for each year's service after 15 years, was enacted and in effect from and after May 12, 1989. I conclude that the entire Chapter 664 as enacted and approved by May 12, 1989, was in effect from and after that date and has not been either amended or eliminated.

The opinion then reaches the following conclusion with which I emphatically disagree:

> The terms of Gulbrandson's retirement benefit contract are determined pursuant to the statutes in effect at the time of his retirement on August 31, 1989. The amendment to § 19-s-502, MCA, via Section 3, Chapter 664, was not yet effective on that date. Therefore, we conclude that Gulbrandson's contract does not include the increased retirement benefit contained in Section 3, Chapter 664 and, as a result, his contract was not impaired by denying him entitlement to that increased benefit.

I agree with the opinion in its statement that the terms of Gulbrandson's retirement benefit contract are determined pursuant to the statutes in effect at the time of his retirement on August 31, 1989--the critical question becomes whether or not Chapter 664, which had been enacted in its entirety and approved by May 12, 1989, could be considered as being in effect in its entirety. In substancec the conclusion of the opinion is that the including of Section 3 of Chapter 664, had absolutely no effect until July 1, 1991. I do not agree with that analysis. Chapter 664 rebuts the opinion's conclusion as it places in effect two charges in the form of fees which are to be paid to the State and remitted by the State into the Retirement Fund for ultimate payment to the judges.

In applying a contract law theory to the contract between Gulbrandson and the State upon his retirement on August 31, 1989,

33

I conclude that the entire Chapter 664 as enacted and approved by May 12, 1989, became a part of that contract. He had the right to rely upon this contact and to the benefits thereof when he retired August 31, 1989. Gulbrandson of course became subject to the express terms of Section 3, which provided that the additional .785% would not be payable prior to July 1, 1991.

I would therefore answer the certified question of the United States District Court by concluding that the benefit increase provided in Chapter 664 provides its benefit to Gulbrandson from and after July 1, 1991.

_____
Justice

34

Justice William E. Hunt, Sr., dissenting.

I dissent.

Even a casual reading of the majority and dissenting opinions filed in this case reveals that there is little left to be said by way of analysis of the law or its application to the facts of this case, and this dissent will not add to those arguments. I have only to say that this Court can and should, in fairness, law, and equity, recognize the contract that existed between the State and Retired Justice Gulbrandson who performed his part of the agreement in full by paying his share of the premium into the retirement fund and serving as judge and justice in the Montana judicial system for nearly 30 years. I do not see how we can do otherwise.

_____
Justice

35

August 24, 1995

CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Thomas K. Hopgood, Esq. *(hand delivered - copy picked up)*
Luxan & Murfitt
P.O. Box 1144
Helena, MT 59624-1144

Roger Tippy, Esq.
Attorney at Law
26 Wedgewood Lane
Voorheesville, NY 12186

Kelly A. Jenkins, Esq.
Montana Department of Administration
Mitchell Bldg., Rm. 155
Helena, MT 59620-0101

Hon. Charles C. Lovell
United States District Judge
301 S. Park, Rm. 504
Federal Bldg., Drawer 10112
Helena, MT 59626

Lou Aleksich, Clerk
U.S. District Court
316 N. 26th Street
Billings, MT 59101

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: *A. Gallagher*
Deputy