No. 12378

IN THE SUPREME COURT OF THE STATE OF MONTANA

1973

---

WILLIAM KIPP,

Plaintiff and Appellant,

-vs-

BILLY WONG, d/b/a
The Standard Bar,

Defendant and Respondent.

---

Appeal from: District Court of the Thirteenth Judicial District,
Honorable C. B. Sande, Judge presiding.

Counsel of Record:

For Appellant:

Joseph P. Hennessey argued, Billings, Montana

For Respondent:

Crowley, Kilbourne, Haughey, Hanson and Gallagher,
Billings, Montana
Stephen H. Foster argued, Billings, Montana

---

Submitted: November 28, 1973

Decided: JAN 10 1974

Filed: JAN 10 1974

Thomas J. Kearney
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

This is an action for damages brought by plaintiff William Kipp in the district court of Yellowstone County against Billy Wong, owner of the Standard Bar, a public bar, as a result of a gunshot wound received by plaintiff while he was a patron in defendant's bar.

Plaintiff brings this appeal from a judgment entered by the district court on a directed verdict in favor of defendant bar owner.

On April 19, 1970, at about 1:30 a.m., plaintiff William Kipp was a customer of the Standard Bar which is located on the south side of Billings, Montana. One Gus Gardiner entered the bar, took a gun from his pocket and rapidly fired three shots. One shot struck William Kipp in the left side of the abdomen causing injuries which resulted in the removal of his left kidney. One shot struck and injured Charles Linderman, and one shot struck Beverly Linderman, his wife, causing her death.

The Standard Bar is a retail beer and liquor establishment owned by operated by Billy Wong since 1967. On the night of the shootings eight persons were employed in the Standard Bar: the defendant Billy Wong, his son and a woman as bartenders, two barmaids, and a three-piece dance band. Billy Wong testified he personally checked identification and kept order in the bar; that fights occasionally occurred in the bar but he was usually able to stop them. If he was unable to stop a fight, he would telephone the police. Wong further testified that he had been a bar operator since 1950, and no shots had been fired in his bars prior to April 19, 1970.

Defendant Wong was 59 years old, five feet seven inches tall and weighed 115 pounds at the time this incident occurred. He stated that in his experience he was better able to keep order personally by using nonviolent means than when he had employed a

"bouncer", because he could usually gain the respect of customers who would attempt to fight a bouncer. He kept a loaded shotgun and pistol behind the bar.

Billy Wong testified he had known Gus Gardiner as a customer for a "couple of years", during which time Gardiner had never caused trouble nor given Wong occasion to order him to leave the bar.

At about 11:00 p.m. on the night the shooting occurred, Gus Gardiner had been in the bar in the company of two other men, Phillip Holiday and Colvin Kingfisher. According to William Smith, plaintiff's witness and a customer of the bar, a dispute between Kingfisher and an unidentified man in the bar resulted in Kingfisher pushing the unidentified man out the back door and into the alley. Smith testified he observed a fight which took place in the alley between Kingfisher and the unidentified man, with Holiday and Gus Gardiner present but apparently not involved in the fight.

The trial court granted an objection to Smith's attempted testimony that shortly after he reentered the bar he heard a sound like a gunshot from the vicinity of the alley. In this connection, a motion in limine was filed by defendant prior to trial seeking to exclude Smith's testimony concerning the "gunshot sound". Smith was permitted to testify, over objection, that he had known Gardiner for five to seven years and his reputation for peace and quiet in the community was "pretty bad".

Jose Romero, a bartender at the Arcade Bar located near the Standard Bar, testified he did not know Gus Gardiner's reputation in the community, but his reputation in the Arcade was bad. Defendant's objection to Romero's testimony was sustained.

John Nelson, a musician in the dance band playing at the Standard Bar the night the shootings occurred, testified that he had a conversation with Billy Wong after the shooting and Wong stated that Gus Gardiner was always in trouble. He further testified, however, that Billy Wong said nothing to indicate Gus

Gardiner had ever caused trouble in the Standard Bar, and that the Standard Bar was peaceful on the evening in question until the time of the shooting.

Billy Wong testified he was aware that Gus Gardiner had been in the Standard Bar on the evening in question, but was unaware of Gardiner's involvement in any altercation, inside or outside the bar. Wong stated Gardiner left the bar around 11:00 p.m. and that he did not see Gardiner again until 1:30 a.m., when the shooting occurred.

The only witness who testified concerning the amount of time which elapsed between Gardiner's entry into the bar and his firing the shots was Kathryn Rolison, a customer, who stated:

> "Q. Would you describe what you saw? A. Seeing the man walk in, he walked around the dance floor and stopped at the table and turned around and smiled, and then turned and pulled a gun out of his pocket and started shooting.
>
> "* * *
>
> "Q. The point number 2 [referring to a diagram] shows about where he was standing when he shot? A. Yes.
>
> "Q. And that was right next to your table? A. Yes.
>
> "Q. How long did he stand there before he pulled the gun out? A. Just momentarily.
>
> "Q. Did he look at you? A. Yes.
>
> "Q. What was his expression? A. Well, he just kind of smiled and turned around.
>
> "Q. What did he do then? A. He started shooting.
>
> "Q. Did he say anything before he started shooting? A. No.
>
> "Q. Did there appear to be anybody with him? A. No.
>
> "Q. Did he fire the shots in quick succession? A. Yes."

Other witnesses testified the shooting appeared to coincide with an argument or fight between two women. However, no connection between the incidents was established.

William Kipp, Charles Linderman and Beverly Linderman, the persons struck by the three bullets, did not know Gus Gardiner.

Defendant's motion for directed verdict was granted by the trial court at the close of the evidence. Plaintiff made a subse-

quent motion for leave of the court to reopen the case and permit an additional witness to be called, a Miss Devorah Howe. Miss Howe was one of the women fighting at the time the shooting occurred. An excerpt from a written statement she made to the Billings police on June 11, 1970, is contained in the record and indicates Miss Howe heard the shots but did not see the shooting. This motion and plaintiff's motion for a new trial were denied.

On appeal, plaintiff assigns six issues for review: Whether the trial court erred:

1) In directing a verdict for the defendant.

2) By permitting the defendant to make an oral motion on the day of trial to limit the plaintiff's voir dire and proof.

3) In limiting the testimony of witness William Smith to what he saw and excluding what he heard.

4) In denying plaintiff's motion to reopen his case.

5) In denying plaintiff's motion for a new trial.

6) In permitting the defendant to voir dire the witness William Smith in the absence of the jury.

Concerning the first issue, plaintiff relies on Nevin v. Carlasco, 139 Mont. 512, 514, 365 P.2d 637, wherein the Court stated:

> "Turning to the remaining specifications of error, we find in 30 Am.Jur., § 523, p. 823, the general obligation of duty and liability to patrons on the premises as follows: 'It has been held that the proprietor of a liquor establishment for on-premises consumption does not hold himself out as an insurer of the safety of his patrons and is not bound to the same degree of care toward them as devolves on innkeepers and carriers, although he does owe them the duty of exercising reasonable care to protect them from injury at the hands of a fellow patron, and of seeing to it that a patron is not injured either by those in his employ or by drunken or vicious men whom he may choose to harbor.'
>
> "Reviewing leading cases from other jurisdictions, [citing cases], we find the general rule to be that the duty of a tavern keeper to protect a patron from injury by another arises only when one or more of the following circumstances exist:
>
> (1) A tavern keeper allowed a person on the premises who has a known propensity for fighting.

(2) The tavern keeper allowed a person to remain on the premises whose conduct had become obstreperous and aggressive to such a degree the tavern keeper knew or ought to have known he endangered others.

(3) The tavern keeper had been warned of danger from an obstreperous patron and failed to take suitable measures for the protection of others.

(4) The tavern keeper failed to stop a fight as soon as possible after it started.

(5) The tavern keeper failed to provide a staff adequate to police the premises.

(6) The tavern keeper tolerated disorderly conditions."

See also: Ganger v. Zook, 141 Mont. 214, 377 P.2d 101.

Nevin was cited by the California court in Slawinski v. Mocettini, 31 Cal.Rptr. 613, 616, 217 C.A.2d 192, quoting the six listed circumstances determinative of negligence. The facts in Slawinski were analogous to those in the instant case: Slawinski was in a bar owned by Mocettini and had a scuffle with one Wilson, after which Slawinski remained in the bar and Wilson left. About thirty minutes later Wilson returned with a gun and killed Slawinski.

The Slawinski case resulted in a jury verdict for Slawinski's survivors, after which the trial court granted the bar owner's motion for a new trial. The California District Court of Appeals affirmed the new trial order, stating in pertinent part:

"While the standard of care is that of an ordinarily prudent person, yet it must be realized that reasonable care is a relative term in that the amount of care must be commensurate with the risks and dangers attending the activity being pursued. * * * The test of whether the duty of reasonable care is discharged is the probability or foreseeability of injury to a plaintiff.

"In the instant case, although there was conflicting evidence as to whether Wilson had a reputation as a hot tempered person, it was uncontroverted that the respondents and their employees were not aware of this fact and had never experienced any trouble with Wilson. * * * There is no evidence that respondents had any way of knowing that Wilson would return." (Emphasis added).

In the instant case, there is the testimony of William Smith, Jose Romero, and John Nelson tending to indicate that Gus Gardiner had a bad reputation in the community for peace and quiet.

- 6 -

However, their testimony did not directly contradict Billy Wong's testimony that Gus Gardiner had never caused trouble in the Standard Bar prior to the night in question. Even assuming, arguendo, the evidence was sufficient to create a factual issue as to whether Wong should have had notice of Gardiner's dangerous propensities, that issue is rendered moot in the face of the uncontradicted evidence that Wong had no way of knowing Gardiner would, or did in fact, return to the bar; and,that Gardiner commenced shooting without any appreciable lapse of time from when he entered the bar and without any threatening words or acts which might have constituted a warning to Wong or his employees.

The fundmental principle of tort law involved is analogous to the body of law set forth in the various "business invitee slip and fall" cases decided by this Court, i.e.: there is no negligence unless (1) the dangerous or injury-causing condition was created by the proprietor; (2) the proprietor had knowledge of the dangerous or injury-causing condition; or (3) the dangerous or injury-causing condition was of such nature and duration that the proprietor is charged with constructive notice thereof. McEnaney v. City of Butte, 43 Mont. 526, 117 P. 893; Demaree v. Safeway Stores, Inc., _____Mont._____, 508 P.2d 570, 30 St.Rep. 405.

Likewise, the factual issue as to whether Wong employed an adequate staff to police his premises is rendered moot under the facts. In Weihert v. Piccione, 273 Wisc. 448, 78 N.W.2d 757,762, cited by this Court in Nevin, the Wisconsin Supreme Court determined an analogous issue in the defendant's favor, stating in pertinent part:

> "The [trial] court was also of a mind that the failure to have provided 'guards' or 'bouncers' in the establishment did not constitute causal negligence, for the reason that had such been provided, it cannot be assumed that they would have prevented the assault which occurred instantly and without warning." (Emphasis added).

In order for the trial court to submit the issue of liability to the jury, the plaintiff must produce evidence which, if viewed in the light most favorable to plaintiff, demonstrates that

defendant was somehow negligent in the performance of a duty owed plaintiff and that defendant's negligence was the proximate cause of plaintiff's injury. Jackson v. William Dingwall Co., 145 Mont. 127, 399 P.2d 236.

Here, the record does not reveal facts which would demonstrate that defendant caused the condition or that he had knowledge of it. The injury-causing condition was not of such a nature or duration that defendant could have been charged with constructive notice.

The second, third and sixth appeal issues all relate to evidence offered by plaintiff through witness William Smith to the effect that a separate shooting apparently occurred in the alley behind the Standard Bar at about 11:00 p.m. on the night in question. There was no proof offered as to whether the sound heard by Smith actually was a gunshot, and, if so, who fired the shot. We concur with the trial court's view that plaintiff failed to demonstrate the probative value or relevance of this offered evidence. We find the trial court acted reasonably and within its sound discretion in granting the pretrial motion to exclude, in examining witness Smith outside the presence of the jury, and in excluding portions of Smith's testimony relating to gunshot sounds.

Concerning the fourth issue on appeal--denial of plaintiff's motion to reopen his case-- this Court stated in Pickett v. Kyger, 151 Mont. 87, 94, 439 P.2d 57:

> "Plaintiff assigns as error the refusal of the trial court to permit her to reopen her case at the conclusion of all the evidence. The record discloses that this motion was made after motion for directed verdict had been made and argued by counsel, and that plaintiff sought to add the testimony of one witness as an expert on the explosive qualities of gas. This witness's testimony was available to plaintiff before the close of evidence in the case and no showing was made as to the qualifications of the witness or the testimony to be elicited from him. On this basis, the trial court denied plaintiff's motion to reopen her case. Ordinarily neither denial of reopening for testimony of a witness available during reception of evidence at trial nor denial of reopening absent a showing of a witness's qualifications and the materiality of his testimony constitutes an abuse of discretion by the trial court. There being no special circumstances shown taking the instant case out of the operation of the general rule, we hold there was no abuse of discretion in refusing the motion of plaintiff to reopen."

See also: Nadeau v. Texas Company, 104 Mont. 558, 69 P.2d 586.

- 8 -

The trial record discloses no offer of proof by plaintiff concerning the failure to call Miss Devorah Howe as a witness during the reception of the evidence.

Concerning the fifth issue on appeal--denial of plaintiff's motion for new trial--the motion was made on these grounds:

1)  Irregularity in the proceedings of the court and adverse party, by which plaintiff was prevented from having a fair trial.

2)  Surprise which ordinary prudence could not have guarded against.

3)  Insufficiency of the evidence to justify the decision.

4)  Error in law occurring at the trial excepted to by the plaintiff.

Plaintiff's arguments in support of his motion for a new trial have heretofore been discussed in this opinion with the exception of ground number 2 which relates to surprise resulting from the testimony of Kathryn Rolison at trial, a portion of which has been quoted heretofore.  Kathryn Rolison made a statement to the Billings police department on April 19, 1970, which included this pertinent excerpt:

> "This male walked very close to our table.  I would say from two to three feet from our table. He stood there for approximately one minute and at the time he smiled at me and I smiled back. I saw this male take a small gun from his right pocket.  Holding the gun about belt high he started shooting.  He held the gun in front of him and I could see the sparks fly every time he shot.  He fired them very fast.  I would estimate that he shot five or six shots.  I was stunned and just couldn't believe it."

The police report was available and Kathryn Rolison was available for interview prior to the trial.  Kathryn Rolison's testimony at trial was consistent with her statement to the police.  It does not appear in the trial record that plaintiff ever sought to interview this witness or requested a continuance after her testimony was given.  We find the trial court acted within its sound discretion in denying plaintiff's motion for

a new trial.  Tigh v. College Park Realty Co., 149 Mont. 358, 427 P.2d 57.

The judgment of the district court is affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices.