No. 01-630

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 67

DEBRA STAVENJORD,

Petitioner and Respondent,

v.

MONTANA STATE FUND,

Respondent, Appellant and Insurer for

PRAIRIE NEST RANCH,

Employer.

APPEAL FROM:     Workers' Compensation Court, State of Montana,
                 The Honorable Mike McCarter, Judge Presiding.

COUNSEL OF RECORD:

    For Appellant:

        Bradley J. Luck (argued), Kelly M. Wills, Garlington, Lohn & Robinson, Missoula,
        Montana
        David A. Hawkins, Special Assistant Attorney General, Helena, Montana

    For Respondent:

        Thomas J. Murphy (argued), Murphy Law Firm, Great Falls, Montana

    For Amicus Montana Defense Trial Lawyers Association:

        Michael P. Heringer, Lisa A. Speare, Brown Law Firm, Billings, Montana

    For Amicus Montana Self-Insurers' Association and Montana Schools Group Insurance
    Authority:

        Oliver H. Goe (argued), Kimberly L. Towe, Browning, Kaleczyc, Berry & Hoven,
        Helena, Montana

For Amicus American Insurance Association:

Charles G. Adams, Jacqueline T. Lenmark, Keller, Reynolds, Drake, Johnson & Gillespie, P.C., Helena, Montana

For Amicus Plum Creek Timber Company, Inc.:

Todd A. Hammer, David M. Sandler, Hammer, Hewitt & Sandler, PLLC, Kalispell, Montana

For Amicus Montana Trial Lawyers Association:

Elizabeth A. Brennan, Rossbach Brennan, P.C., Missoula, Montana

For Amicus Montana Injured Workers Resource Council:

Larry A. Anderson, Attorney at Law, Great Falls, Montana

Argued: March 28, 2002
Submitted: April 18, 2002
Decided: April 1, 2003

Filed:

_____
Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1 The Petitioner, Debra Stavenjord, filed a petition for hearing before the Workers' Compensation Court for the State of Montana in which she alleged that she had contracted an occupational disease on April 1, 1998, arising from her employment with Prairie Nest Ranch and that her employer was insured against workers' compensation claims by the Respondent, Montana State Fund. She contended that because the benefits provided to her for partial disability pursuant to § 39-72-405(2), MCA (1997), were less than provided for the same partial disability pursuant to § 39-71-703, MCA (1997), of the Workers' Compensation Act, she was denied equal protection of the law in violation of Article II, Sec. 4 of the Montana Constitution. After the parties agreed on the relevant facts, the Workers' Compensation Court held that based on our decision in *Henry v. State Compensation Ins. Fund*, 1999 MT 126, 294 Mont. 449, 982 P.2d 456, Stavenjord had been denied equal protection of the law and entered judgment for her in the amount she would have received pursuant to the Workers' Compensation Act. The Montana State Fund appeals from that conclusion. We affirm the judgment of the Workers' Compensation Court.

¶2 The Montana State Fund raises the following issues on appeal:

¶3 1. Whether the Workers' Compensation Court abused its discretion when it declined to reopen the record at the request of the Respondent to allow additional evidence of the historical and anatomical differences between injuries and occupational diseases.

¶4 2. Whether the Workers' Compensation Court erred when it concluded that § 39-72-405, MCA (1997), of the Occupational Disease Act violated the equal protection clause of

3

the Montana Constitution.

## DISCUSSION

¶5 The parties agreed to the following facts which form the basis for the Workers' Compensation Court's decision:

¶6 Debra Stavenjord contracted an occupational disease arising out of and in the course of her employment with Prairie Nest Ranch in Cascade County, Montana, on April 1, 1998, when she was diagnosed with epicondylitis of both elbows. She had surgery on both elbows. She also had cervical disc removal surgery. (It is not clear from the facts whether the cervical disc removal surgery was related to her occupational disease.)

¶7 At the time of her injury, Stavenjord's employer was enrolled in compensation plan III of the Workers' Compensation Act and its insurer was the State Compensation Insurance Fund.

¶8 After Stavenjord reached maximum medical improvement, she was given a 12% impairment rating of the whole person. As a result of her condition, her lifting ability had been diminished. She had previously been able to perform heavy work but as a result of her condition, could only perform work in the "light" category.

¶9 Stavenjord sustained a wage loss of more than $2 per hour and would have been entitled to a permanent partial disability rate of $198 under the Montana Workers' Compensation Act. Because of the extent of her impairment, her age (45 years), her education (11th grade), her lifting restrictions and her wage loss, she would have been entitled to $27,027 for permanent partial disability benefits if her entitlement was calculated

4

pursuant to § 39-71-703, MCA (1997), the partial disability provision of the Montana Workers' Compensation Act.

¶10 However, the maximum that Stavenjord could recover pursuant to § 39-72-405, MCA (1997), of the Occupational Disease Act, even though she suffered a wage loss and could no longer return to her former employment, was $10,000.

¶11 In the Workers' Compensation Court, Stavenjord argued that § 39-72-405(2), MCA (1997), violated her right to equal protection of the law by limiting her to less compensation for her disability than she would be entitled to for the same degree of disability under the Workers' Compensation Act. She invoked her right to equal protection pursuant to Article II, Section 4 of the Montana Constitution. She contended that her situation was similar to that of the petitioner in *Henry v. State Compensation Ins. Fund*, 1999 MT 126, 294 Mont. 449, 982 P.2d 456, and that the Workers' Compensation Court was bound by that decision.

¶12 In response, the State Fund argued that benefits provided pursuant to § 39-71-405(2), MCA, are not technically "partial disability" benefits; the class of claimants entitled to benefits under the Workers' Compensation Act are not similarly situated to those claiming benefits pursuant to the Occupational Disease Act; and that the public policy set forth at § 39-71-105, MCA (1997), to provide benefits to injured or diseased workers in an expeditious fashion with a minimal amount of legal involvement provided a rational basis for treating the two classes differently. The State Fund also contended that this state's ability to compete with other states economically would be affected by the nature and amount of benefits provided for work-related injuries and diseases and that the disparate treatment of

5

injured and diseased workers furthered that economic interest.

¶13 The Workers' Compensation Court held that its decision was compelled by our decision in *Henry v. State Compensation Ins. Fund* and that the broad language used in that opinion contraindicated limiting its affect to only the type of benefits (vocational rehabilitation benefits) at issue in that case. As a result, the Workers' Compensation Court held that Stavenjord was entitled to permanent partial disability benefits in the amount of $27,027.

¶14 After the Workers' Compensation Court's decision and judgment were entered, the State Fund moved for reconsideration or rehearing and for an order re-opening evidence. The State Fund sought to offer additional evidence of the historical difference between injuries and occupational diseases. Those motions were denied.

STANDARD OF REVIEW

¶15 Whether to reopen a case for the introduction of further evidence after the case has been submitted to the court is within the discretion of the trial court. Its ruling, upon the request to reopen, will not be disturbed by this Court unless there has been a clear abuse of discretion. *Cole v. Helena Light & Ry. Co.* (1914), 49 Mont. 443, 143 P. 974.

¶16 The Workers' Compensation Court's decision on the merits was based on its construction of constitutional law. We review conclusions of law to determine whether they are correct. *See Henry*, ¶ 10 (citing *State v. Butler*, 1999 MT 70, ¶ 7, 294 Mont. 17, ¶ 7, 977 P.2d 1000, ¶ 7).

ISSUE ONE

6

¶17    Did the Workers' Compensation Court abuse its discretion when it declined to reopen the record at the request of the Respondent to allow additional evidence of the historical and anatomical differences between injuries and occupational diseases?

¶18    The State Fund contends that the Workers' Compensation Court abused its discretion when it denied its motion to reopen evidence so that it could offer statistical evidence demonstrating that most occupational disease claims do not involve herniated intervertebral discs such as were at issue in *Henry* and that, therefore, the traditional reasons for treating occupational diseases differently from injuries are as applicable now as ever.

¶19    In *Cole*, we held that:

> The reopening of a case for the introduction of further evidence after it has been closed is within the discretion of the trial court.  Its ruling upon the request to reopen will not be disturbed by the appellate court, unless there has been a clear abuse of discretion. [Citations omitted.]

*Cole*, 49 Mont. at 453, 143 P. at 976.

¶20    In *Kipp v. Wong* (1974), 163 Mont. 476, 484, 517 P.2d 897, 902, we stated:

> Ordinarily neither denial of reopening for testimony of a witness available during reception of evidence at the trial nor denial of reopening absent a showing of a witness's qualifications and the materiality of his testimony constitutes an abuse of discretion by the trial court.

¶21    We conclude that the State Fund could have offered the evidence for which it sought to reopen its case prior to the close of evidence and that it did not demonstrate the materiality of the evidence in support of its motion to reopen.  The State Fund sought to prove the nature of most occupational disease claims and their similarity to the traditional occupational diseases discussed by this Court in *Eastman v. Atlantic Richfield Co.* (1989), 237 Mont. 332,

7

777 P.2d 862. However, Stavenjord's challenge to the constitutionality of § 39-72-405(2), MCA (1997), was not based on the traditional treatment of occupational diseases nor the types of claims that are currently being brought by others. It was based upon the current definition of occupational disease as opposed to the current definition of injury and based upon her own condition of epicondylitis, which the State concedes is an inflammatory disease of the connective tissues of the elbow which develops over time. Stavenjord's affliction is exactly the kind of condition that would traditionally have been treated as an injury under the Workers' Compensation Act but is no longer treated as such based upon definitional changes made to § 39-71-703, MCA, and § 39-72-405(2), MCA, in 1987. For example, in *Hoehne v. Granite Lumber Co.* (1980), 189 Mont. 221, 615 P.2d 863, we held that Carpel Tunnel Syndrome caused over time by the continual strain involved in lifting and stacking lumber was an injury pursuant to the definition formerly found at § 39-71-119(1), MCA, even though it could not be related to any specific incident and "developed gradually" over time. We held that pursuant to the pre-1987 definition of injury, all that had to be shown was a chain of actions resulting in physical harm to some part of the body from unusual strain. *Hoehne*, 189 Mont. at 225, 615 P.2d at 865.

¶22 Therefore, because there is no indication that the evidence which the State Fund sought to offer following trial was not available prior to trial and because the evidence of other claims for occupational disease were not material to the issue involved in this case, we conclude that the Workers' Compensation Court did not abuse its discretion when it denied the State Fund's motion to reopen the evidence.

ISSUE 2

¶23 Did the Workers' Compensation Court err when it concluded that § 39-72-405, MCA (1997), of the Occupational Disease Act violated the Equal Protection Clause of the Montana Constitution?

¶24 The State Fund contends that the Workers' Compensation Court erred by concluding that § 39-72-405(2), MCA (1997), violates Stavenjord's right to equal protection of the law because 1) injured workers and those with occupational diseases are not similarly situated; 2) if this Court concludes they are similarly situated, there is a legitimate government interest in treating the two classes differently; and 3) the manner in which the legislature has chosen to treat the two classes is rationally related to that legitimate interest. The State Fund also contends that this case presents facts more similar to those before the Court in *Eastman v. Atlantic Richfield Co.* (where the Court was asked to address the equal protection issue based on a difference in the amount of benefits provided) than *Henry v. State Compensation Ins. Fund* (where workers with occupational diseases were completely denied the vocational rehabilitation benefit at issue.) Finally, the State Fund asks that we limit our holding in *Henry* to the unique factual circumstances presented in that case where a worker was denied benefits under the Workers' Compensation Act simply because his herniated intervertebral disc was caused over two work shifts rather than one.

¶25 Stavenjord, of course, contends that her right to equal protection was violated for the same reason that we concluded that Jerry Henry's right to equal protection was violated and that the result in this case is compelled by our decision in that case.

9

¶26 Before considering our decisions in *Eastman* and *Henry* and applying them to the circumstances before us, it is appropriate to consider the statutory framework applicable to Debra Stavenjord's claim.

¶27 The legislature's objective for enactment of the 1997 Workers' Compensation Act and Occupational Disease Act as they relate to compensation of workers who sustain a reduction in their earning capacity due to a work-related injury or disease is set forth in the legislature's declaration of public policy found at § 39-71-105, MCA (1997), which provides in relevant part as follows:

> For the purposes of interpreting and applying Title 39, chapters 71 and 72, the following is the public policy of this state:
>
> (1) *It is an objective of the Montana workers' compensation system to provide, without regard to fault, wage supplement and medical benefits to a worker suffering from a work-related injury or disease.* Wage-loss benefits are not intended to make an injured worker whole; *they are intended to assist a worker at a reasonable cost to the employer.* Within that limitation, *the wage-loss benefit should bear a reasonable relationship to actual wages lost as a result of a work related injury or disease.* [Emphasis added.]

¶28 The manner in which the legislature sought to provide a partial wage loss benefit for workers suffering an "injury" as defined at § 39-71-119, MCA (1997), is set forth at § 39-71-703, MCA (1997), of the Workers' Compensation Act. Without setting forth that statute in its entirety, it provides for a partial disability benefit based on the injured worker's actual wage loss, permanent impairment, age, education and occupational limitations. The parties agree that based on those factors, if Stavenjord had met the definition of "injury," she would have been entitled to permanent partial disability benefits in the amount of $27,027.

10

¶29 However, the legislature sought to compensate workers who suffer a wage loss as the result of an occupational disease at § 39-72-405(2), MCA (1997), of the Occupational Disease Act which provides that when an employee cannot return to his or her employment due to an occupational disease and suffers a wage loss as a result, that employee can be paid an amount not exceeding $10,000.

¶30 We first considered disparate legislative treatment under the Workers' Compensation Act and the Occupational Disease Act in *Eastman*. In that case, the claimant had been employed as a welder for Atlantic Richfield Company's aluminum plant from 1977 until 1985. He was diagnosed with chronic obstructive pulmonary disease leading to steroid dependency which caused severe physical and emotional side affects. He petitioned the Workers' Compensation Court for workers' compensation benefits based on his contention that his condition had been aggravated by a single incident which led to smoke and fume inhalation while at work. The Workers' Compensation Court held that he suffered from an occupational disease and was limited to $10,000 of benefits pursuant to the Occupational Disease Act.

¶31 Eastman appealed the Workers' Compensation Court decision. However, according to the dissenting opinion, Eastman was:

> [F]orced to surmount hurdles that would challenge even the greatest trial tactician. He appears before this Court pro se because his attorney, after collecting his fee, merged his law firm with the firm representing Arco.

*Eastman*, 273 Mont. at 343, 777 P.2d at 868 (Hunt, J., dissenting).

¶32 Whatever the reason, Eastman filed his appeal and his brief on appeal without the

11

benefit of counsel. Furthermore, the equal protection issue for which this Court's opinion in *Eastman* is cited, had not even been raised in the Workers' Compensation Court when he was represented by counsel. Normally this Court would not reach a constitutional issue under those circumstances. Currently this Court would at least not allow the result to be cited a precedent under those circumstances. However, in *Eastman* the Court, in a 4-3 opinion, acknowledged the general rule and then, without the benefit of adequate briefing by Eastman, decided the issue anyway. The Court stated:

> It is a general rule that new issues may not be raised for the first time on appeal. [Citation omitted.] However, this Court "reserves to itself the power to examine constitutional issues that involve broad public concerns," and even if raised for the first time on appeal, this Court can hear the issue if the alleged error affects the substantial right of a litigant. [Citation omitted.] <u>Claimant has not briefed his constitutional contentions in detail.</u> Nonetheless, considering the nature of such contentions as well as his pro se status, we will consider his constitutional challenges.

*Eastman*, 237 Mont. at 337, 777 P.2d at 865 (emphasis added).

¶33 The Court then went on to decide the constitutional rights of the pro se claimant whose trial counsel had not raised the constitutional issue and who had not briefed his constitutional contentions in detail adversely to the claimant. More importantly, the Court decided the issue based on the definition of "injury" found at § 39-71-119, MCA (1985) –not the definition at issue in this case. *See Eastman*, 237 Mont. at 341, 777 P.2d at 867.

¶34 In *Eastman*, the Court first concluded that no fundamental right was at issue and that the disparate treatment of injured and diseased workers should be analyzed under the rational basis test which required a legitimate government objective which bore some rational

12

relationship to the classifications in question. The Court proceeded to discuss the historical substitution of the no-fault compensation act for the type of injuries that were the subject of common law liability for employers and the more recent enactment of the Occupational Disease Act in 1959 as the incidents of devastating diseases in the work place also increased. *Eastman*, 237 Mont. at 338-39, 777 P.2d 865-66. Then, without further analysis, the Court concluded that there was a rational basis for the enactment of the Occupational Disease Act and that *Eastman*, the pro se claimant, ". . . has failed to show that the legislature is required to award the same or comparable benefits under the Occupational Disease Act as compared to the Workers' Compensation Act."

¶35   The Court concluded without further explanation that:

> We hold that there is a rational basis for the benefits awarded under the Occupational Disease Act and that the claimant has failed to establish a violation under the equal protection clauses of the Montana Constitution and of the Constitution of the United States.

*Eastman*, 237 Mont. at 339, 777 P.2d at 866.

¶36   Ten years later, following substantial revision to the definitions of "injury" and "occupational disease" by the 1987 Legislature, this Court considered a second challenge to disparate treatment of workers with "injuries" and workers with "occupational diseases" in *Henry*. In that case, the claimant, Jerry Henry, suffered a herniated intervertebral disc in his back while moving and lifting appliances for his employer. However, the injury apparently occurred over more than one work shift because it was treated as an occupational disease. After reaching maximum medical improvement, Henry sought but was denied rehabilitation

13

benefits because they were not available under the Occupational Disease Act even though Henry was unable to return to the job he performed at the time of his injury as a result of his herniated disc. On appeal, Henry contended that he was denied equal protection of the law based on the fact that he was denied benefits for an occupational disease that were available pursuant to the Workers' Compensation Act if he had been "injured."

¶37 We began our analysis with a historical review of the Workers' Compensation Act and the Occupational Disease Act. We acknowledged, as we did in *Eastman*, that the workers' compensation system is an outgrowth of tort law, *Henry*, ¶ 12; that the workers' compensation system was not originally designed to compensate workers suffering from occupational diseases, *Henry*, ¶ 13; but that due to the frequency of diseases such as silicosis and asbestosis in the work place, the Occupational Disease Act was finally enacted in Montana in 1959. *Henry*, ¶ 14. We noted that based on the historical circumstances that gave rise to each act, an "injury" was defined differently from an "occupational disease" but that in 1987, those terms were significantly redefined so that now, rather than focusing on the nature of the medical condition, the terms are differentiated based on the number of work shifts over which a worker contracts an affliction. *Henry*, ¶¶ 15 and 18.

¶38 We pointed out that the public policy of the 1987 Workers' Compensation Act and Occupational Disease Act, as it relates to vocational rehabilitation benefits, was set forth in § 39-71-105(2), MCA (1987), where the legislature provided that:

> [I]t is an objective of the workers' compensation system to return a worker to work as soon as possible after the worker has a suffered a work related injury or disease.

14

¶39    We pointed out, however, that vocational rehabilitation benefits for the purpose of getting workers back to work were only provided for in the Workers' Compensation Act and not the Occupational Disease Act.

¶40    In *Henry*, for the purposes of equal protection analysis of benefits provided to injured or diseased workers, we applied the rational basis test and stated that:

> The rational basis test requires the government to show (1) that the statute's objective was legitimate, and (2) that the statute's objective bears a rational relationship to the classification used by the legislature. Stated another way, the statute must bear a rational relationship to a legitimate governmental interest. [Citations omitted.]

*Henry*, ¶¶ 32-33.

¶41    We identified the Legislature's objective as the declaration of public policy previously set forth from § 39-71-105(2), MCA (1987), and agreed that the early return to work of an employee following an injury or disease is a legitimate objective. *Henry*, ¶¶ 34-35. However, we held that elimination of workers suffering occupational diseases from access to rehabilitation benefits bore no rational relationship to the government objective of returning workers to work as soon as possible. We held that there was no rational basis for providing rehabilitation benefits to workers based simply on the number of work shifts over which a worker is injured. *Henry*, ¶¶ 38-39. Furthermore, we held that economic reasons are not sufficient justification for treating the class of workers injured during one shift differently from the class of workers injured from activity or events that occurred over more than one work shift. *Henry*, ¶ 40.

¶42    We distinguished *Henry* from *Eastman* for two reasons. The first was that in

15

*Eastman*, the Court was concerned with the degree of benefits awarded to a similarly situated claimant while in *Henry* one group of similarly situated claimants was totally denied a type of benefit. It is on that language that the State Fund now relies for its argument that this case is more similar to *Eastman* than to *Henry*. However, we also distinguished *Eastman* for the following reason which is equally applicable to this case:

> Second, Eastman filed his claim for compensation benefits in 1985, prior to the 1987 amendments to the WCA and the ODA. As pointed out earlier, after the 1987 amendments to the WCA and the ODA, the definitions of "injury" and "occupational disease" no longer focus on the nature of the medical condition, but rather focus on the number of work shifts over which the worker incurs an injury. Thus, the historical justification for treating workers differently under the WCA and the ODA no longer exists. Indeed, the entire underpinnings of *Eastman* have evaporated, rendering its continued validity questionable.

*Henry*, ¶ 43.

¶43 In *Henry*, we concluded:

> [T]hat providing rehabilitation benefits to workers covered by the WCA, but not to workers covered by the ODA, is not rationally related to the legitimate governmental interest of returning workers to work as soon as possible after they have suffered a work related injury. We hold that the ODA violates the equal protection clause of the Montana Constitution to the extent that it fails to provide vocational rehabilitation benefits . . . .

*Henry*, ¶ 45.

¶44 We conclude that our reasoning in *Henry* is equally applicable to the facts before us and that our holding in *Henry* compels the result reached by the Workers' Compensation Court.

¶45 As we have previously stated, legislative enactments are presumed constitutional and

the party challenging the constitutionality of a statute bears the burden of proving the statute unconstitutional beyond a reasonable doubt. *State v. Butler*, 1999 MT 70, ¶ 8, 294 Mont. 17, ¶ 8, 977 P.2d 1000, ¶ 8.

¶46    As we did in *Henry*, we identify the two classes involved in the present case as those workers whose benefits are provided for pursuant to the Workers' Compensation Act and those workers whose benefits are provided for pursuant to the Occupational Disease Act. However, since 1987, they are distinguished merely by the number of work shifts over which their work-related affliction is sustained. Therefore, as in *Henry*, the two classes on appeal remain "(1) workers who suffer a work related injury on one shift; and (2) workers who suffered a work related injury on more than one work shift." *Henry*, ¶ 27. We conclude that they are similarly situated because regardless of the number of days over which their condition occurs or the mechanism which causes their affliction, they are, for purposes of the facts in this case, both physically impaired as a result of work related activity and both in need of wage supplement benefits to compensate for the impairment to their earning capacity.

¶47    We identify the government's objective or interest in this case by the declaration of public policy found at § 39-71-105(1), MCA (1997), as to provide a wage loss benefit which bears "a reasonable relationship to actual wages lost as a result of a work-related injury or disease." (Emphasis added). However, we conclude that the disparate treatment of disabled workers based simply on the length of time over which their injury or disease is sustained is not rationally related to that legitimate governmental interest.

17

¶48 Therefore, we conclude that providing partial disability benefits to a person in Stavenjord's situation in the amount of $27,027 under the Workers' Compensation Act but limiting her wage supplement to $10,000 under the Occupational Disease Act violates the Equal Protection Clause found at Article II, Section 4 of the Montana Constitution. For that reason, we conclude that our holding in *Eastman v. Atlantic Richfield Company* is not applicable to those wage supplement benefits provided for at § 39-71-703, MCA, and § 39-72-405(2), MCA, since 1987 and we affirm the decision and judgment of the Workers' Compensation Court.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ JIM REGNIER
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART

18

Justice Jim Rice dissenting in part and concurring in part.

¶49 I respectfully dissent with the Court's holding on Issue 2.

¶50 The Court arrives at a conclusion which seems to be "fair." Indeed, requiring equal compensation for workers suffering from an equal impairment would also seem to be the essence of constitutional "equal protection." However, it is not. In reaching its decision, the Court has applied an incomplete constitutional analysis.

¶51 The Court's opinion consists of a restatement of the rationale offered by the Court in *Henry v. State Compensation Ins. Fund*, 1999 MT 126, 294 Mont. 449, 982 P.2d 456, and a conclusion that "our reasoning in *Henry* is equally applicable to the facts before us." Thus, a critique of the Court's holding here must necessarily address *Henry*. First, however, a complete statement of our standards of constitutional review must be provided.

¶52 As the Court notes, the constitutionality of a legislative enactment is prima facie presumed, and every intendment in its favor will be presumed, unless its unconstitutionality appears beyond a reasonable doubt. *Powell v. State Compensation Ins. Fund*, 2000 MT 321, ¶ 13, 302 Mont. 518, ¶ 13, 15 P.3d 877, ¶ 13; *State v. Price*, 2002 MT 229, ¶ 27, 311 Mont. 439, ¶ 27, 57 P.3d 42, ¶ 27. But further, *the question of constitutionality is not whether it is possible to condemn, but whether it is possible to uphold the legislative action*, which will not be declared invalid unless it conflicts with the constitution beyond a reasonable doubt. *Powell*, ¶ 13; *Price*, ¶ 27. *Every possible presumption* must be indulged in favor of the constitutionality of a legislative act. *Powell*, ¶ 13; *Price*, ¶ 28. If *any* doubt exists about a

20

statute's constitutionality, that doubt *must be resolved in favor of the statute*. *Powell*, ¶ 13; *Price*, ¶ 28. If these words have actual meaning, they require a different result here.

¶53 The Court in *Henry* summarized its equal protection analysis of the 1987 amendments to the Workers' Compensation Act (WCA) and the Occupational Disease Act (ODA) by its now-famous statement:

> In sum, we can see no rational basis for treating workers who are injured over one work shift differently from workers who are injured over two work shifts. Simply put, a herniated disc is a herniated disc.

*Henry*, ¶ 44. Today, the Court again embraces this rationale *in toto*, concluding that workers injured under the two Acts "are distinguished *merely* by the number of work shifts over which their work-related affliction is sustained" and that such "disparate treatment of disabled workers based *simply* on the length of time" is not rationally related to a legitimate government interest. *See* ¶¶ 46 and 47 (emphasis added). However, the conclusion that workers injured under the two Acts are distinguished only by the number of work shifts was erroneous in *Henry* and is erroneous today. Although this error, given the issues in *Henry*, may not have affected the outcome there, it does so here.

¶54 *Henry*'s conclusion that the 1987 amendments had fundamentally altered the definitions of "injury" and "occupational disease" so that they "no longer focus on the nature of the medical condition, but rather focus on the number of work shifts over which the worker incurs an injury" was flawed, in the first instance, because it failed to recognize that

21

pre-1987 law had not focused on the nature of the condition either.[1]  *Henry*, ¶ 43.  Prior to 1987, this Court had recognized that the two distinctions between injury and disease were those which Larson had explained in his treatise, i.e., unexpectedness and time-definiteness:

> The two crucial points of distinction between accident and occupational disease were the elements of unexpectedness and time-definiteness.  What sets occupational diseases apart from accidental injuries was both the fact that they could not honestly be said to be unexpected, since they were recognized as inherent hazards of continued exposure to conditions of the particular employment, and the fact that they were gradual rather than sudden in onset.  *Thus, what would ordinarily be an occupational disease might be converted to an accident* by an unusual and sudden dosage of the same kind of dust or fumes that, absorbed gradually over a long period, would produce typical industrial disease.

*Larson, Workmen's Compensation Law*, Vol. 1B, § 41.31 (1987) (emphasis added).

Application of these factors led to numerous decisions involving various medical conditions which were considered either as injury, or as disease, depending only on *how* they occurred.  Thus, for example, in 1983, we concluded that a phlebitis condition in the worker's legs was an injury, rather than a disease, because of the manner in which it had developed–from extra work shifts during the course of one week.  *Wise v. Perkins* (1983), 202 Mont. 157, 656 P.2d 816.  We noted in *Wise* that the "two critical points of distinction" between injuries and diseases "are time definiteness and unexpectedness," citing to Larson.  *Wise*, 202 Mont. at 166, 656 P.2d at 820.  Finding that the phlebitis neither "developed over time" nor was

---

[1] Arguably, there was more of a "focus" on the nature of the condition at issue when the ODA specifically listed occupational diseases, such as silicosis, anthrax and tamarack poisoning, as opposed to the general reference to "all diseases," for which the ODA was later amended to provide coverage.  However, coverage for both injuries and diseases has always been dependent upon, and thus "focused" on, causation, as our case law reveals.

"expected" from Wise's work activities, we concluded that the condition constituted an injury and not a disease. *Wise*, 202 Mont. at166, 656 P.2d at 820. Thus, the decision turned on the manner in which the condition was sustained, or caused, *not* the nature of the condition itself.

¶55 The Court's citation to *Hoehne v. Granite Lumber Co.* (1980), 189 Mont. 221, 615 P.2d 863, precisely illustrates this point. The Court asserts that Stavenjord's affliction, epicondylitis, "is exactly the kind of condition that would traditionally have been treated as an injury." *See* ¶ 21. Support for this proposition is drawn from *Hoehne*, wherein we concluded that the carpel tunnel syndrome at issue was an injury. *Hoehne* is another case which demonstrates that it was not the nature of a condition which resulted in an injury determination, but rather, the manner by which the condition had been caused: by "a tangible happening of a traumatic nature." In other words, under pre-1987 law, a medical condition was considered an "injury" when it was caused by an event or events defined as an injury under the statute. In *Hoehne*, we determined that the carpel tunnel syndrome was caused by a chain or series of "tangible happenings" (repeatedly stacking lumber), and therefore, constituted an injury. *Wise* and many other cases were decided on the same rationale. Thus, *Henry*'s conclusion that pre-1987 law was focused on the nature of the condition is simply not tenable. Rather, the focus has always been causation –the manner in which the condition was sustained. Indeed, the current proximate cause provision for occupational diseases, set forth in § 39-72-408, MCA, and discussed below, is identical to

23

the proximate cause provision contained in the original Occupational Disease Act enacted by the Legislature in 1959. *See* 1959 Mont. Laws, ch. 155, sec. 5.

¶56 However, court decisions applying these statutes gave rise to considerable uncertainty in the law, and obvious difficulty in ascertaining whether conditions were injuries or diseases. The 1987 amendments sought to clarify and simplify this determination, as well as to fulfill other stated purposes: eliminate time-consuming, costly litigation, provide benefits to injured workers "speedily," and provide constant premiums to employers. *See* § 39-71-105, MCA (1987), "Declaration of public policy." However, notwithstanding the 1987 revisions, the traditional factors which distinguished injuries and diseases, namely, time-definiteness and unexpectedness, as well as other distinctions, were clearly retained, and remain a part of the 1997 version at issue here, and are discussed below. Thus, *Henry*'s conclusion that these distinctions had been erased in 1987 was also flawed.

¶57 Causation for an injury is defined in § 39-71-119, MCA:

> (2) An injury is caused by an accident. An accident is:
>     (a) an unexpected traumatic incident or unusual strain;
>     (b) identifiable by time and place of occurrence;
>     (c) identifiable by member or part of the body affected; and
>     (d) caused by a specific event on a single day or during a single work shift.
> . . . .
> (4) "Injury" or "injured" does not include a disease that is not caused by an accident.

In contrast to the above definition of injury, but consistent with pre-1987 law, an occupational disease is now defined as the same medical condition which would constitute an injury, but which occurs on more than one day or work shift, and which is proximally

24

caused by the employment, a requirement which must not be demonstrated in order to establish an injury. Section 39-72-408, MCA, states as follows:

> **Proximate causation.** Occupational diseases shall be deemed to arise out of the employment only if:
> (1) there is a direct causal connection between the conditions under which the work is performed and the occupational disease;
> (2) the disease can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment;
> (3) the disease can be fairly traced to the employment as the proximate cause;
> (4) the disease does not come from a hazard to which workmen would have been equally exposed outside of the employment;
> (5) the disease is incidental to the character of the business and not independent of the relation of employer and employee.

This proximate cause provision is necessary for occupational disease conditions because there is no clearly identifiable work injury caused by a single accident. As in pre-1987 law, time-definiteness and unexpectedness remain as the two causation-related distinctions between injury and disease. Further, the condition may be caused, in part, by conditions outside of employment, and thus, a connection to the employment must be established.

¶58 In a discussion of the differing exclusivity statutes for injuries and diseases, a dissenting opinion in *Torres v. State* (1995), 273 Mont. 83, 902 P.2d 999, noted some of the fundamental distinctions between diseases and injuries, including the possibility that diseases may have contributing causes from outside of the employment, based upon the above-quoted definition of proximate cause, which, as mentioned, has been in effect since the ODA was originally enacted. The dissenting opinion explained that the distinctions between injuries and diseases required a different application of their respective exclusivity provisions:

25

[A]n occupational disease, by definition, occurs over a prolonged period of time, and unlike an industrial injury, may be caused from conditions that existed not only in the workplace, but elsewhere. That is why the Occupational Disease Act, unlike the Workers' Compensation Act, specifically provides for apportionment of disability benefits based on the percent of a given disease or disability that is attributable to exposure that occurs during the course of employment. Section 39-72-706(1), MCA, specifically provides in relevant part that:

"[I]f disability . . . from any other cause not itself compensable is aggravated, prolonged, accelerated, or in any way contributed to by an occupational disease, the compensation payable under this chapter must be reduced and limited to such proportion only of the compensation that would be payable if the occupational disease were the sole cause of the disability . . . as such occupational disease as a causative factor bears to all the causes of such disability . . . ."

In other words, under the Occupational Disease Act, a claimant is entitled to recover only that portion of his or her disability benefits which represents the portion of his or her disability that arose out of employment. The Act specifically allows for an employer to disclaim liability for any portion of a person's disability which is unrelated to employment. Therefore, based upon the previously mentioned statutes, that portion of disability would not be covered by the exclusive remedy provision found at § 39-72-305, MCA.

*Torres*, 273 Mont. at 92, 902 P.2d at 1005 (Trieweiler, J., dissenting). Thus, an occupational disease, unlike an injury, can develop over the course of time, while on duty and off duty, and while the claimant is working for more than one employer. The ODA, unlike the WCA, contemplates such development and the proper compensation therefor. However, this distinction, and the others discussed herein, have been brushed aside by the Court's adoption of *Henry*'s erroneous conclusion that the only difference between the WCA and ODA is the number of shifts involved.

26

¶59 There are other distinctions as well. Consistent with its determination that injury and disease are caused differently, the Legislature enacted different notice provisions under each Act. Under the Workers' Compensation Act, an injured worker must, within 30 days after the occurrence of the accident, give notice of the time and place of the accident, and the kind of injury sustained, to the employer or insurer. Because accidents are often obvious happenings, actual knowledge of the accident by the employer is deemed to be sufficient notice of the claim. Section 39-71-603(1), MCA. No such deeming of notice is provided for occupational diseases.

¶60 In contrast to the WCA's 30-day requirement, the ODA requires a claim to be filed "within 1 year from the date the claimant knew or should have known that the claimant's condition resulted from an occupational disease." Section 39-72-403(1), MCA. These distinctive notice provisions are tied to the fundamental differences between injuries and diseases which remain in the law.

¶61 Further, consistent with its recognition of the differences between injuries and diseases, the Legislature created distinctions in the financial benefits which are available under the two Acts. It is this difference which the Court finds troubling, because the claimant here would have received a higher benefit had she sustained an injury, instead of a disease. While it is natural to feel sympathetic to someone in the claimant's situation, a failure of parity can occur between any number of claimants under these Acts, depending on the circumstances, including the possibility that an ODA claimant may receive more than a WCA claimant, and this should not render the Acts unconstitutional. The Nevada Supreme

27

Court, when faced with a similar equal protection challenge to Nevada's occupational disease act by a diseased worker who was not eligible to obtain permanent partial disability benefits under a statute which limited those benefits to injured workers, recognized that:

> [I]t is evident the legislature had a rational basis for denying permanent partial disability benefits to individuals suffering from an occupational disease. Diseases take a period of time to develop, and objective manifestations exacerbate and remit as an illness progresses. Arguably, this exacerbation-remission cycle makes it difficult to assess the anatomical percentage which may be assigned to a partial disability, and, therefore, we view the legislature as justified in drawing the distinction in question. We note, since 1947 the legislature has paid particular attention to the Occupational Disease Act through repeated amendment, but has never seen fit to provide permanent partial disability awards for occupational respiratory diseases. [Citations omitted.] *While it may be a better practice to provide such compensation to a diseased employee, that determination must rest with the legislature.*

*Holt v. Nevada Industrial Commission* (Nev. 1978), 578 P.2d 752, 753 (emphasis added).

¶62    Imbedded into the constitutional law of this country and this state is the principle that the legislature is the body which is charged with drawing lines and making choices, even if those choices are illogical or unfair. These differences, in and of themselves, do not render such decisions violative of equal protection. As we have recognized:

> To a certain extent, nearly all legislation sets forth classifications regarding applicability, benefits and recipients; the fact that some of these classifications are imperfect does not necessarily mandate a conclusion that they violate the equal protection clause.

*Gulbrandson v. Carey* (1995), 272 Mont. 494, 503, 901 P.2d 573, 579 (citing *Arneson v. State* (1993), 262 Mont. 269, 274, 864 P.2d 1245, 1248). In fact, a presumption arises that

28

imprudent legislative decisions will ultimately be corrected by the legislative body. As noted

by the United States Supreme Court:

> [C]ourts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws. The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.

*Vance v. Bradley* (1979), 440 U.S. 93, 97, 99 S.Ct. 939, 942-43, 59 L.Ed.2d 171, 176.

*Vance*'s statement that the legislature must act with "antipathy," at least inferred, to violate

equal protection guarantees, is a requirement which has been reiterated by this Court. As we

recently held in *Price*:

> "It is a basic equal protection principle that the invidious quality of a law claimed to be discriminatory must ultimately be traced to an impermissibly discriminatory purpose." [*State v.*] *Spina*, ¶ 85 [1999 MT 113, 294 Mont. 367, 982 P.2d 421] (citing *Washington v. Davis* (1976), 426 U.S. 229, 240, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597, 607-08). None exists here.

*Price*, ¶ 41.

¶63    Neither has such a purpose been demonstrated here. Without a doubt, the Legislature

chose to draw lines which differentiated injuries from diseases, established different timing

and administrative requirements for each type of claim, and provided different benefits for

each. However, reviewing these Acts as a whole, instead of focusing on the single factor of

the number of work shifts, reveals that the appropriate legislative purposes at work

here–provision of workable definitions of injury and disease, elimination of prolonged

litigation by a self-administering system, speedy payment of benefits to workers, and

constant insurance rates for employers–are legitimately served by the statutory scheme.  I conclude from this review, and the historical distinctions between injury and disease that still prevail in the law, that there is a class of workers who sustain an injury, and a separate class of workers who sustain an occupational disease, and that these classes are not, for the reasons discussed above, similarly situated.  It is, therefore, "possible to uphold the legislative action." *Powell*, ¶ 13.  I would do so and reverse the decision of the Workers' Compensation Court, which necessarily followed the erroneous language expressed in *Henry*.

¶64     Given that the Acts' legitimate purposes are demonstrated in the legislation itself, I find no error in the Workers' Compensation Court's denial of the State Fund's motion to reopen evidence, and therefore, on that issue, I concur with the Court.


/S/ JIM RICE


Chief Justice Karla M. Gray joins in the foregoing dissenting and concurring opinion of Justice Rice.


/S/ KARLA M. GRAY